James T. GRIGSBY, Petitioner,

v.

James MABRY, Commissioner, Arkansas Department of Correction, Respondent.

Dewayne HULSEY, Petitioner,

v.

Willis SARGENT, Superintendent of the Cummins Unit Penitentiary, Grady, Arkansas, Respondent.

Ardia McCREE, Petitioner,

v.

Vernon HOUSEWRIGHT, Director, Arkansas Department of Correction, Respondent.

Nos. PB–C–78–32, PB–C–81–2 and PB–C–80–429.

United States District Court, E.D. Arkansas, Pine Bluff Division.

Aug. 5, 1983.

James T. Grigsby, pro se.

Ardia V. McCree, pro se.

Matthew T. Horan, Fayetteville, Ark., for Dewayne Hulsey.

Victra L. Fewell, Joseph H. Purvis, Asst. Attys. Gen., Dennis R. Molock, James Cullum, Asst. Attys. Gen., Little Rock, Ark., for respondents.

William R. Wilson, Jr., Little Rock, Ark., Patrick T. Seaver, Los Angeles, Cal., Reed E. Hundt, Michael Chertoff, Washington, D.C., John Charles Boger, New York City, Sandra T. Berry, Little Rock, Ark., for petitioners.

## MEMORANDUM OPINION

EISELE, Chief Judge.

Pending before the Court are the habeas corpus petitions of James T. Grigsby, Dewayne Hulsey and Ardia McCree, who have been in the custody of the Arkansas Department of Correction since their convictions for capital murder. Each petitioner contends that his conviction must be set aside due to the exclusion for cause at the guilt determination phase of his trial of certain venirepersons who during *voir dire* professed adamant scruples against the death penalty. The Court concludes that the process, as used in these cases, of "death qualification" of prospective · petit jurors suffers from two serious constitutional defects: first, it denies the accused a trial by a jury representative of a cross-section of the community; and second, it creates juries that are conviction-prone. The death-qualification process as practiced under Arkansas law, being unconstitutional, the writ

must issue, but only in Mr. McCree's case for the reasons stated below.

## I. *Background: Prior Proceedings and Facts.*

All three petitioners were convicted of capital murder. Mr. Grigsby was so convicted in Franklin County, Arkansas, in September 1976. Mr. Hulsey was convicted in Ouachita County, Arkansas, in November 1975. Mr. McCree was convicted in Ouachita County, Arkansas, in 1978.

After Mr. Grigsby's conviction, the State waived the death penalty, and he was sentenced to life in prison without parole. After Mr. Hulsey's conviction, a penalty trial was held in front of the same jury. Mr. Hulsey was sentenced to die. After Mr. McCree's conviction, he was sentenced to life in prison without parole.

This Court, in an earlier opinion, concluded that one of the prospective jurors in Mr. Hulsey's case was improperly excluded from the penalty phase of the trial because she did not unequivocally state that she could not impose the death sentence. This Court therefore ordered that the death sentence imposed upon Mr. Hulsey be vacated on the basis of *Witherspoon v. Illinois,* 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968).

In Mr. Hulsey's trial, nine jurors were excused for cause because of their opposition to the death penalty. The State used all but four of its peremptory challenges in excluding other jurors. Mr. Hulsey's trial attorney made no objection to the exclusion for cause of death-scrupled veniremen. This Court therefore concluded, in an earlier opinion, that Mr. Hulsey could not raise the "Grigsby" issue on Federal habeas corpus review because of the doctrine of *Wainwright v. Sykes,* 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977) (contemporaneous objection rule bars consideration absent cause and prejudice). *See also Engle v. Issac,* 456 U.S. 107, 102 S.Ct. 1558, 71 L.Ed.2d 783 (1982). *Hulsey v. Sargent,* 550 F.Supp. 179 (E.D.Ark.1981). The remainder of Mr. Hulsey's claims in support of his habeas corpus petition have been set for hearing commencing on September 30, 1983.

In petitioner McCree's trial, eight prospective jurors were excused for cause from the guilt-innocence phase because they stated that they could not impose the death penalty. The State used three of its peremptory challenges in excluding other prospective jurors from the panel who had expressed less adamant opposition to the death penalty, i.e., persons who could not be excluded for cause under *Witherspoon.* Mr. McCree's trial attorney made a timely objection to the exclusion of death-scrupled veniremen for cause. The remainder of Mr. McCree's arguments for the issuance of a writ of habeas corpus were considered and rejected by the Honorable Elsijane T. Roy. *McCree v. Housewright,* No. PB–C–80–429 (E.D.Ark. Jan. 6, 1982). Judge Roy's decision was affirmed by the Eighth Circuit Court of Appeals. *McCree v. Housewright,* 689 F.2d 797 (8th Cir.1982), *cert. denied sub. nom., McCree v. Lockhart,* —— U.S. ——, 103 S.Ct. 1782, 76 L.Ed.2d 352 (1983).

The facts concerning the *voir dire* and challenges in the Grigsby capital murder trial are set forth in the earlier decision of this Court, *Grigsby v. Mabry,* 483 F.Supp. 1372 (E.D.Ark.1980). Based upon these facts, this Court on May 16, 1979, sent the *Grigsby* case back to the Franklin County Circuit Court so that Mr. Grigsby would have an opportunity to present evidence in support of his motion that potential jurors opposed to capital punishment not be excluded for cause during the guilt determination phase of his trial. It was further Ordered that the evidentiary hearing commence not later than May 31, 1980. *Id.* at 1391. Both parties appealed. By a two-to-one decision, the Eighth Circuit Court of Appeals affirmed the trial court's decision to require an evidentiary hearing, but determined that the federal district court would be the appropriate forum therefor. In that connection Judge Lay stated:

> This court has recognized the broad discretion of the district court to "send a case back to the state courts to resolve issues more properly considered by the

judge who experienced the trial first hand." *United States ex rel. McQueen v. Wangelin,* 527 F.2d 579, 581 (8th Cir. 1975); *see also Hart v. Eyman,* 458 F.2d 334, 338–40 (9th Cir.), *cert. denied,* 407 U.S. 916 [92 S.Ct. 2441, 32 L.Ed.2d 691] (1972). The issues in this case, however, are not of the kind more properly considered by the judge who experienced the trial first hand. *Cf. Jackson v. Denno,* 378 U.S. 368 [84 S.Ct. 1774, 12 L.Ed.2d 908] (1964); *Boles v. Stevenson,* 379 U.S. 43 [85 S.Ct. 174, 13 L.Ed.2d 109] (1964); *Patterson v. Lockhart,* 513 F.2d 579, 581 (8th Cir.1975); *United States ex rel. Fisher v. Driber,* 546 F.2d 18, 22 (3d Cir.1976). The issues here are (1) whether prospective jurors were disqualified because of their death penalty views, (2) if they were, whether the resulting death-qualified jury was more prone to convict Grigsby or to convict him of a higher degree of murder, and (3) if it was, what legal remedy should be accorded Grigsby. There are no special circumstances or relevant cases which indicate that the trial court is a more appropriate forum than the district court for resolution of these issues.

*Grigsby v. Mabry,* 637 F.2d 525, 528–29 (8th Cir.1980).

The district court, after the original hearing, had "hesitantly" concluded that petitioner Grigsby would be denied relief based upon his contention that his constitutional right to a jury drawn from a fair, representative cross-section of the community was violated.[1] In a footnote to Judge Lay's majority opinion, it is stated:

We also vacate the district court's finding that the defendant was not denied a jury composed of a cross-section of the community. Because the record is to be supplemented by further evidence and in view of the close relationship of petitioner's claim on the cross-section issue to the guilt-proneness claim, the district court should, upon completion of all the evidence, enter its findings on both claims. In this way there can be a single appeal on both issues regardless of the outcome in the district court on either issue.

*Id.* at 529 n. 5.

As noted above this decision is made with respect to three different habeas petitions. James Grigsby, Dewayne Hulsey, and Ardia McCree filed separate habeas corpus petitions in which they challenge, among other things, the exclusion for cause by the State from the guilt determination phases of their capital murder trials of those prospective jurors who were adamantly opposed to the death penalty. The petitions were therefore consolidated for the determination of this issue only. An evidentiary hearing was held on July 13–17 and July 29–31, 1981, in this Court. The case was submitted much later after extensive briefing.[2]

As a result of the evidence introduced at the hearing scheduled after the remand of the case, and after further research, this Court has reconsidered its decision that petitioners not prevail on their claim that they were unconstitutionally denied a jury composed of a representative cross-section of the community. The Court now concludes, as stated above, that the petitioners must prevail, both on that contention and also upon their claim that juries death-qualified under the *Witherspoon* standard are more likely to convict than juries from which persons are not excused on the basis of

1. This Court granted relief to the petitioner on the ground that "the refusal of the [state] trial court to allow a continuance so that the petitioner could attempt to make the evidentiary showing suggested in *Witherspoon* of the guilt-proneness of 'death qualified' juries so seriously denigrated his constitutional right to an impartial jury that the denial amounted to an abuse of discretion." 483 F.Supp. at 1388.

2. At the time of the 1980 decision, Mr. Grigsby was in the custody of the Arkansas Department of Correction. On June 27, 1983, Mr. Grigsby died in his cell. All parties have agreed that the death-qualified jury claim of Mr. McCree remained pending for this Court's decision. On June 30, 1983, the Court notified the attorneys that it would proceed with a resolution of the issues on Mr. McCree's behalf. In addition, the Court notes that Mr. Hulsey and the State will benefit from a resolution of those issues, in the event that this Court's finding of a waiver is eventually reversed by a higher court.

their adamant feelings for or against the death penalty. An analysis of the substantive issues follows.

II. *Denial of a Jury Drawn From a Fair, Representative Cross-Section of the Community*

A. *The History of This Issue in This Case:*

After a long discussion of the development of the principle that there is a constitutional right to a jury drawn from a group which represents a fair cross-section of the community, this Court stated that:

[T]he exclusion on *Witherspoon* grounds of scrupled jurors from the guilt determination phase of a trial would seem to run afoul of the Sixth Amendment guarantees.

*Grigsby* 483 F.Supp. at 1384. However, the Court concluded that there were two "roadblocks" to this conclusion:

(1) *Witherspoon* itself, and (2) the argument that the two scrupled *Witherspoon* groups (that is, those adamantly opposed to the death penalty and those mildly opposed to the death penalty) are not "distinctive" one from the other and that, therefore, if you exclude only one of such groups, the presence of the other group on the jury panel will still ensure that the jury is "representative." *Cf. [United States v.] Olson,* [473 F.2d 686 (8th Cir. 1973)], *supra.*

\* \* \* \* \* \*

This Court is, of course, aware that the group barred in *Witherspoon* was larger than the group barred in this case. However, in view of cases decided subsequent to *Witherspoon* by the Supreme Court, it is not at all clear that the question concerning representation in the guilt determination phase of the trial would be answered the same way it appears to have been answered by the *Witherspoon* decision. *See supra,* p. 1380. But *Witherspoon* has not been specifically overruled, and this Court, hesitantly, concludes that it must follow that precedent. This conclusion is reinforced by the Court's belief

that the Eighth Circuit and the Supreme Court might uphold *Witherspoon,* as here applied, even after, and in the face of *Taylor* [*v. Louisiana,* 419 U.S.?522, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975)], on the theory that no "distinctive" group has been excluded and that the State's interest in having *one* jury determine guilt *and* sentence would justify the removal of those adamantly opposed to capital punishment by for-cause challenges.

*Grigsby* at 1384–85. The Eighth Circuit case of *United States v. Olson,* 473 F.2d 686 (8th Cir.1973), set forth the rationale of the principal "roadblock." In that case it was alleged that an identifiable community group, to wit, persons aged 18 to 20, were excluded, and that the effect of this was to deny the petitioner there his Sixth Amendment right to a representative jury. Judge Matthes stated:

Accordingly, the dispositive question is whether persons aged eighteen to twenty compose an "identifiable group" which cannot be systematically excluded from jury service without rendering juries nonrepresentative of community attitudes. But appellant has "failed to show that the attitudes of this group [18–20] are inadequately represented by those several years older than they, that is, that eighteen to twenty-one year olds are a distinct, cognizable group." *United States v. Deardorff,* 343 F.Supp. 1033, 1043 (S.D. N.Y.1971). "The difference in viewpoint between ages [eighteen to twenty and twenty-one to twenty-five, for example] . . . would not seem to us of any great significance . . . . *King v. United States,* 346 F.2d 123, 124 (1st Cir.1965). Accordingly, we hold that persons aged eighteen to twenty are not an identifiable group the exclusion of which renders a jury list nonrepresentative of the community and violative of the Fifth and Sixth Amendments.

*Olson,* 473 F.2d at 688 (emphasis added). It appears from the opinion that there was no evidence or empirical data from which the Court could determine whether the "decisional outlook" of persons between ages 18

to 20 differed from that of the 21 to 25 age group in any significant manner. The Court stated that it regarded it "as highly speculative whether the decisional outlook of such excluded persons would be different from that of persons a mere few years older." *Id.* (quoting *King v. United States,* 346 F.2d 123, 124 (1st Cir.1965)). So in the *Olson* case the Eighth Circuit was confronted with a record from which it could not determine if the 18 to 20 year old group was a "distinctive, identifiable group."

This Court questions whether, as a general rule, a group, to qualify as a substantial, distinctive and identifiable class, must necessarily hold a "distinctive attitude" unrepresented by others on the jury. The theory of the representation cases is generally to the contrary. One has only to consider that contention in connection with the exclusion of women or blacks. The vice lies not in the assumption of the truth of the proposition that blacks or women hold distinct attitudes unrepresented by white males—although they might[3]—but in the removal of *any* significant qualified group from the panel without some good cause. And, conceptually, no showing is required to establish that the removal of such a large "distinctive" group would result in a jury more guilt-prone or more likely to convict because we are dealing here with what, under the Sixth Amendment, is properly considered a "jury"—not the same question as what, under the Sixth Amendment, is an "impartial jury." However, when a particular group is *defined by its distinctive attitudes,* as here, it is obviously necessary for the proponent to establish the existence of a group whose "decisional outlook" is different from that of non-excluded people. By the same token it is open to the opponent to attempt to show the contrary. Whether *Olson* might be wrong on the above analysis is beside the point. Here we must deal with "distinctive attitudes" and "decisional outlook" because such criteria are needed to define the group at issue.

Before dealing with the specific "cross-section, representative" jury issue presented in this case, it will be useful to review the history of the development of that concept.

**B.** *The Pre-Duncan Development of the Cross-Section Principle:*

The right to a fair cross-sectional, representative, jury has been based upon the due process and equal protection clauses of the Fourteenth Amendment and also upon the Sixth Amendment. The Sixth Amendment did not become applicable to state criminal prosecutions until *Duncan v. Louisiana,* 391 U.S. 145, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968). Therefore, prior to 1968, the focus was upon the due process and equal protection clauses of the Fourteenth Amendment. The earliest cases dealt with the exclusion of blacks from jury service. In *Strauder v. West Virginia,* 100 U.S. 303, 25 L.Ed. 664 (1880), a West Virginia statute which permitted only white males above the age of 21 to serve as jurors was challenged by a black defendant. The Supreme Court ruled that under the Fourteenth Amendment, ". . . the Statute . . . amounts to a denial of the equal protection of the laws to a colored man . . . ." *Id.* at 310. Although the main thrust of the *Strauder* opinion is to vindicate the purpose of the Fourteenth Amendment to assure to blacks the enjoyment of all the civil rights that are enjoyed by white persons, the language of the opinion contained implications that went beyond that narrow thrust. The Court indicated that the exclusion of an entire class of people would violate the equal protection clause even if those excluded were white men or "naturalized Celtic Irishmen." *Id.* at 308. The Court said:

> The very idea of a jury is a body of men composed of the peers or equals of the person whose rights it is selected or summoned to determine; that is, of his neighbors, fellows, associates, persons having the same legal status in society as that which he holds . . . ."

---

**3.** The evidence in this case demonstrates that statistically they do hold different attitudes to-

ward the death penalty from those possessed by white males. *See infra.*

*Id.* In *Hernandez v. Texas,* 347 U.S. 475, 74 S.Ct. 667, 98 L.Ed. 866 (1954), the Supreme Court in a unanimous decision extended this doctrine to strike down the systematic exclusion of Mexican-Americans from jury service.

As indicated above, prior to *Duncan,* the Supreme Court had no occasion to consider the importance of the Sixth Amendment in connection with state criminal trials since the jury trial requirement of the Sixth Amendment was deemed inapplicable to the state courts.[4]

The idea that juries should be reflective of our democratic form of government was advanced in the cases of *Thiel v. Southern Pacific Co.,* 328 U.S. 217, 66 S.Ct. 984, 90 L.Ed. 1181 (1946), and *Ballard v. United States,* 329 U.S. 187, 67 S.Ct. 261, 91 L.Ed. 181 (1946). In *Thiel* the Court invalidated a jury selection system under which daily wage earners were systematically excluded from the venire. The Court said, "American tradition of trial by jury . . . contemplates an impartial jury drawn from a cross-section of the community." 328 U.S. at 220, 66 S.Ct. at 985. In *Ballard,* the Court reversed a conviction and dismissed an indictment because women had been systematically excluded from jury service. In *Smith v. Texas,* 311 U.S. 128, 130, 61 S.Ct. 164, 165, 85 L.Ed. 84 (1940), the Court stated, "it is part of the established tradition in the use of juries as instruments of public justice that the jury be a body truly representative of the community . . . ." In *Pierre v. Louisiana,* 306 U.S. 354, 358, 59 S.Ct. 536, 538, 83 L.Ed. 757 (1959), the Court said, "[T]rial by jury cease(s) to harmonize with our traditional concepts of justice at the very moment particular groups, classes or races—otherwise qualified to serve as jurors in a community—are excluded as such from jury service."

It must be remembered that, although the *Witherspoon* case was decided by the Supreme Court two weeks after its decision in the *Duncan* case, the *Witherspoon* trial had occurred years earlier. Indeed, the *Witherspoon* majority opinion does not mention *Duncan* and does not rest upon Sixth Amendment grounds. In *Witherspoon* the Court held that the exclusion of death-scrupled persons to an extent unnecessary to obtain jurors who could obey their oath to decide impartially the issues submitted to them violated a capital defendant's right to due process in the determination of penalty. The Court stated, "The State of Illinois has stacked the deck against the petitioner. To execute this death sentence would deprive him of his life without due process of law." 391 U.S. at 523, 88 S.Ct. at 1778.

Although *Peters v. Kiff,* 407 U.S. 493, 92 S.Ct. 2163, 33 L.Ed.2d 83 (1972), was decided after *Duncan,* the trial in *Peters* had occurred prior to *Duncan.* Therefore, the *Peters* decision was based upon the due process requirements of the Fourteenth Amendment. In *Peters,* Justice Marshall, in a plurality opinion, held that the systematic exclusion of blacks constituted a denial of the due process rights of any defendant, black or white:

> When any large and identifiable segment of the community is excluded from jury service, the effect is to remove from the jury room qualities of human nature and varieties of human experience, the range of which is unknown and perhaps unknowable . . . .
>
> \* \* \* \* \* \*
>
> It is in the nature of the practices here challenged that proof of actual harm, or lack of harm, is virtually impossible to adduce. \* \* \* In light of the great potential for harm latent in the unconstitutional jury-selection system, and the strong interest of the criminal defendant in avoiding that harm, any doubt should be resolved in favor of giving the opportunity for challenging the jury to too

4. Federal trial courts have always been required to try criminal cases by jury, both because of the requirements of article III, section 2, of the United States Constitution and because of the requirements of the Sixth Amendment. In overseeing jury trials in federal courts, the Supreme Court could rely either upon its interpretation of the Constitution or upon the exercise of its supervisory power over proceedings in inferior courts.

many defendants, rather than giving it to too few.

*Peters v. Kiff,* 407 U.S. at 503–04, 92 S.Ct. at 2168–69 (footnote omitted).

Finally, when the Supreme Court in *Duncan* first extended the protection of the Sixth Amendment to defendants in state criminal cases it reasoned:

> A right to jury trial is granted to criminal defendants in order to prevent oppression by the Government . . . . Providing an accused with the right to be tried by a jury of his peers gave him an inestimable safeguard against the corrupt or overzealous prosecutor and against the compliant, biased, or eccentric judge . . . . The deep commitment of the Nation to the right of jury trial in serious criminal cases as a defense against arbitrary law enforcement qualifies for protection under the Due Process Clause of the Fourteenth Amendment, and must therefore be respected by the States.

391 U.S. 145, 155–56, 88 S.Ct. 1444, 1450–51, 20 L.Ed.2d 491 (1968).

### C. *Post-Duncan Development:*

After *Duncan,* the Supreme Court had several occasions to deal directly with the Sixth Amendment requirements. It concluded that a "representative jury" was necessary, *Williams v. Florida,* 399 U.S. 78, 90 S.Ct. 1893, 26 L.Ed.2d 446 (1970), and that a criminal trial jury should consist "of a group of laymen representative of a cross-section of the community." Finally, in *Taylor v. Louisiana,* 419 U.S. 522, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975), representativeness became the central consideration:

> We accept the fair-cross-section requirement as fundamental to the jury trial guaranteed by the Sixth Amendment and are convinced that the requirement has solid foundation . . . .

*Id.* at 530, 95 S.Ct. at 697. On that predicate it declared that the exclusion of women was unconstitutional, stating:

> . . . jury wheels, pools of names, panels or venires from which juries are drawn must not systematically exclude distinctive groups in the community and there-

by fail to be reasonably representative thereof.

*Id.* at 538, 95 S.Ct. at 701.

### D. *Analysis:*

Courts have generally refused to deal with the question of representativeness or "fair cross-section" in the abstract. In *Duren v. Missouri,* 439 U.S. 357, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979), the Supreme Court placed the burden upon the party challenging the jury selection process to disprove its representativeness; that is, to show that the jury panel fails in some significant way to reflect the community. And it must show that this result occurred because the group was systematically excluded by the selection procedure under attack. The court stated:

> In order to establish a prima facie violation of the fair-cross-section requirement, the defendant must show (1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process.

439 U.S. at 364, 99 S.Ct. at 668.

What is a "distinctive" group that may not systematically be excluded? First, it must be noted that if the exclusion of just any group were fatal, no practical jury system could survive. As a practical matter, one must first inquire whether the characteristic that defines the group is of any consequence to the proper functioning of the jury. For instance, some juries have been selected from lists composed of persons whose last names began with certain letters of the alphabet. Or a jury might be drawn from persons whose birthdays fall in odd or even months. Clearly, such systems would have the effect of excluding large numbers of people, but would those excluded be considered a "distinctive group" and would their exclusion be of any real consequence in terms of jury function?

It should be noted from these examples that the identifying criteria used automatically prevents the group excluded from having any "distinctive" characteristics different from the group remaining. In fact, it is assumed in these cases that the method of exclusion is randomly based and, therefore, that both the group excluded and the group remaining would continue to be "representative cross-sections of the community." Put another way, the method used prevents the removal of any "identifiably distinctive" group. In this connection it should be emphasized that such methods do not, directly or indirectly, have the effect of diminishing the representation on the panel of any "distinctive" group such as blacks or females. This is important here because, as will be noted below, the removal of "*Witherspoon excludables*" does have the indirect effect of lessening the representation of certain groups such as the poor, women, blacks, and certain ethnic and religious groups. *See Grigsby,* 483 F.Supp. at 1384.

■ Once a cognizable, distinctive group has been identified, the party making the challenge must show that this group is somehow systematically excluded. This exclusion need not be purposeful. It can result from either *de jure* exclusion by statute (*e.g., Strauder*), *de facto* exclusion by local practice (*e.g., Thiel*), or disproportionate exclusion resulting from the availability of exemptions (*e.g., Duren*). Here, the exclusion results from the *voir dire* process permitted. This particular process of exclusion has not been involved in prior cases. This is understandable when one realizes that death qualification is the only procedure in our criminal justice system which has the effect of systematically excluding an entire group of fair and impartial jurors because of a particular attitude that they possess upon a matter that is irrelevant to their service as jurors in the trial of the issue of the guilt or innocence of the accused.

■ Once the challenging party establishes a prima facie case under *Duren,* the state must justify the procedure used. As stated in *Duren* the state must show that "a significant state interest . . . [is] manifestly

and primarily advanced by those aspects of the jury-selection process . . . that result in the disproportionate exclusion of a distinctive group." 439 U.S. at 367–68, 99 S.Ct. at 670–71. And, as previously pointed out, once a violation of the fair cross-section requirement has been established, prejudice to the defendant is presumed. *See Peters v. Kiff,* 407 U.S. at 503–05, 92 S.Ct. at 2168–70.

So this discussion brings us back to where we left off in this Court's first opinion in *Grigsby.* Do the "*Witherspoon* -excludables" constitute a "cognizable group," the systematic exclusion of which during the guilt determination phase would constitute a violation of the Sixth and Fourteenth Amendments?

Since *Duncan,* the Sixth Amendment focus has been upon the interposition between the accused and his accuser of the common sense judgment of a jury chosen from a group which truly represents the full range of community attitudes and perspectives that are relevant to the jury functioning process.

The empirical approach to the problem of ascertaining the existence of cognizable groups can be seen developing in the cases. In dealing with groups other than racial minorities and women, the Supreme Court has hesitated to assume any automatic correlation between demographic characteristics and relevant jury-functioning attitudes. This explains the age group cases, such as *United States v. Olson,* i.e., in the absence of empirical data showing that young people between the ages of 18 and 20 possess distinctive attitudes relevant to the jury functioning process from those attitudes held by other young persons between the ages of 21 and 25, the Court was unwilling to assume that the exclusion of the 18-to-20 year old group would destroy the representativeness of the jury. Or, put another way, the Court was unwilling to assume that the 18-to-20 year old group was a "distinctive" cognizable group in relationship to pertinent jury functions. Likewise, courts have refused to assume that pertinent juror attitudes might be determined by place of resi-

dence. *See United States v. Butera,* 420 F.2d 564 (1st Cir.1979). And some courts have followed the same approach in dealing with the exclusion of economic groups.

The case at hand is *sui generis:* persons otherwise qualified are being removed because of a shared attitudinal perspective, and it is clear that the shared attitude is distinctive, i.e., it is not held by those who are not so excluded. As stated in this Court's first opinion:

> It cannot be doubted that ... those excluded for cause pursuant to *Witherspoon* constitute an identifiable group. No one else will represent their strong viewpoint on the jury in their absence. Indeed, the United States Supreme Court itself has drawn the line to create the two, assumedly *different,* groups: those with mild scruples who may *not* be excused for cause and those who will never impose the death penalty who may be so excused. And the Supreme Court's analysis clearly suggests that the difference is not merely quantitative. The first group simply does not represent the absolutist attitude of the more strongly scrupled group.

*Grigsby v. Mabry,* 483 F.Supp. at 1382.

But is this shared attitudinal perspective with respect to penalty significant at the guilt determination phase? Empirical data might show, for instance, that the 18-to-20 age group has a separate and distinct view with respect to a certain style of music or dress from the 21-to-25 age group. But would such distinction alone serve to make the 18-to-20 year old group "cognizable" for jury functioning purposes? Probably not. But it turns out that death penalty attitudes are at the opposite extreme. Those views are intimately tied to other attitudes and views which are directly implicated when jurors determine the guilt or innocence of a defendant in a criminal trial.

The evidence shows that "*Witherspoon* excludables" generally share an amalgam of interrelated attitudes toward the criminal justice system which is distinct from that possessed by "death qualified" jurors. Indeed, the evidence has now demonstrated that such attitudes of the "*Witherspoon* ex-cludables" are different and distinctive even as compared to those mildly scrupled persons, i.e., those who have some negative attitudes towards the death penalty, but nevertheless could impose it in some cases. Such evidence undercuts the idea that the mildly scrupled jurors who are not excluded under *Witherspoon* would adequately represent the attitudes of those who are excluded under *Witherspoon.* *See* discussion of studies, *infra.*

Furthermore, the evidence establishes that one consistent and inevitable result of the death-qualification process is the disproportionate exclusion of blacks and women. *See* discussion of studies, *infra.* This particular finding might indeed make it redundant to note, as the Court has above, that the evidence shows that the mildly scrupled jurors do not adequately represent the perceptions and perspectives of the "*Witherspoon* excludables." In other words, since the death qualification process clearly impacts more heavily upon blacks and women, it can be argued that no further showing is necessary.

As Judge Lay pointed out in the Eighth Circuit's decision, the issues concerning representativeness and guilt-proneness, although different, are closely interrelated in this case. For convenience, the empirical studies relating to *both* of such issues will be discussed under "guilt proneness," in Section II below.

Prospective jurors who subjectively honestly believe, and swear, that they can fairly and impartially try the issues of fact relating to the guilt-innocence of the defendant should be permitted to serve even though we know that some prospective jurors are more likely to convict than others. The U.S. Supreme Court implicitly recognized this basic concept in *Adams v. Texas,* 448 U.S. 38, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980). It will be recalled that, under the "nullifier" prong of *Witherspoon,* the state could exclude persons whose death penalty views would prevent them from being impartial on the question of the defendant's guilt. In *Adams,* however, the Court refused to permit disqualification for the unwill-

ingness or inability of a prospective juror to swear, in accordance with a Texas statute, that the possibility that the defendant might be executed would not affect that person's deliberations on any issue of fact. Why? Because the Court felt this would be permitting exclusion of capital punishment objectors on a "broader basis" than that permitted by *Witherspoon.* The court has apparently recognized that death penalty ideas (and perhaps other ideas) may unconsciously affect how a person views and interprets evidence, how he understands the ideas of "presumption of innocence" or of "proof beyond a reasonable doubt," or the evidence relating to certain defenses. Yet that person may, in courtroom parlance, be a perfectly "good" juror—"good for the State" and "good for the defense"—because he honestly can, and honestly believes he can, try the issue of the defendant's guilt-innocence solely upon the basis of the law and the evidence. The language of the Supreme Court in the *Adams* case is instructive:

> Such a test could, and did, exclude jurors who stated that they would be "affected" by the possibility of the death penalty, but who apparently meant only that the potentially lethal consequences of their decision would invest their deliberations with greater seriousness and gravity or would involve them emotionally. Others were excluded only because they were unable positively to state whether or not their deliberations would in any way be "affected." But neither nervousness, emotional involvement, nor inability to deny or confirm any effect whatsoever is equivalent to an unwillingness or an inability on the part of the jurors to follow the court's instructions and obey their oaths, regardless of their feelings about the death penalty. The grounds for excluding these jurors were consequently insufficient under the Sixth and Fourteenth Amendments. Nor in our view would the Constitution permit the exclusion of jurors from the penalty phase of a Texas murder trial if they aver that they will honestly find the facts and answer the questions in the affirmative if they

are convinced beyond reasonable doubt, but not otherwise, yet who frankly concede that the prospects of the death penalty may affect what their honest judgment of the facts will be or what they may deem to be a reasonable doubt. Such assessments and judgments by jurors are inherent in the jury system, and to exclude all jurors who would be in the slightest way affected by the prospect of the death penalty or by their views about such a penalty would be to deprive the defendant of the impartial jury to which he or she is entitled under the law. 448 U.S. at 49–50, 100 S.Ct. at 2528–29 (footnotes omitted).

So it is recognized that each of us is the product of our genes and experience. Each of us views things from different perspectives. We simply see things differently. No jury system can survive which permits exclusion upon the basis of a showing of just any unconscious predilections which might tend to favor the defendant or the state. Once again we must start with the democratic premise of the *inclusion* of those who can honestly swear that they can, and will, try the case upon the basis of the law and the evidence.

■ Although, as pointed out in *Thiel,* there can be no certainty that the broad spectrum of community views on economic, social, religious, racial, or political issues will be present on any particular jury, we can be certain that prospective jurors, "be selected by court officials *without systematic and intentional exclusion of any of these groups."* 328 U.S. at 220, 66 S.Ct. at 985 (Emphasis supplied). Inclusion, not exclusion, must be the basic rule. Professor Winick makes the point this way:

> To subject jury challenges to scrutiny under the sixth amendment, however, is not to say that the absence or substantial underrepresentation of any particular group on a petit jury violates the cross-section requirement. A defendant is not entitled to "a jury of any particular composition," or to a jury that mirrors the community. The random application of unobjectionable jury selection methods,

or the legitimate exercise of challenges for cause or peremptory challenges, will often result in particular juries that do not even approximately mirror the community. Indeed, a jury of twelve could never reflect all the distinctive groups in the population. A defendant is entitled only to jury selection procedures which do not "systematically exclude distinctive groups in the community."

Winick, *Prosecutorial Peremptory Challenge Practices in Capital Cases: An Empirical Study And A Constitutional Analysis,* 81 Mich.L.Rev. 1, 65–66 (1982) (footnote omitted) [hereinafter cited as *Peremptory Challenges in Capital Cases*].

The Court readopts what it stated in its first *"Grigsby"* opinion concerning the size of the excluded group, adding only that the evidence presented at the hearing after remand reinforces the conclusion that the group is of substantial size both nationally and within the state of Arkansas, ranging between 11% and 17% of those eligible for jury service. So the group excluded is both distinctive and sizeable.

■ To meet the second element of the *Duren* test for establishing a prima facie violation of the fair cross-section requirement, the petitioners must show that the representativeness of the group "in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community." *See* 439 U.S. at 364, 99 S.Ct. at 668. The Court finds that the petitioners have made the requisite showing. However, before moving on the Court will deal with one of the arguments of the respondent on this point.

The respondent suggests that the Sixth Amendment cross-section requirement should apply only to the pool or venires and not to actual juries. And the Fifth Circuit has recently made a similar suggestion. *Smith v. Balkcom,* 660 F.2d 573, 583 n. 26 (5th Cir.1981). Such a contention flies in the face of the policies underlying the cross-section requirement and, if accepted, would provide a device for avoiding the effect thereof. Professor Winick's remarks in

*Peremptory Challenges in Capital Cases, supra,* are again on target:

The concept of the jury as representing a fair cross-section of the community serves not only the interest of the litigants in a fair trial, i.e., the assurance of at least some degree of what Mr. Justice Frankfurter called "diffused impartiality," but significant societal goals as well. Community participation in the jury system comports with "our basic concepts of a democratic society and a representative government." Moreover, it is also "critical to public confidence in the fairness of the criminal justice system." These goals would not be accomplished if the representativeness requirement pertained only to jury pools, and if challenges systematically could be used in such a way that the juries actually selected are "made up of only special segments of the populace or if large, distinctive groups are excluded." Moreover, the essential purpose of the jury—to interpose the "common sense judgment of the community as a hedge against the over-zealous or mistaken prosecutor and in preference to the professional or perhaps over-conditioned or biased response of a judge"—is not achieved if the over-zealous prosecutor or over-conditioned judge can eliminate the representative character of the jury through the jury challenge process.

The systematic use of jury challenges should thus be subject to scrutiny under the sixth amendment cross-section requirement.

81 Mich.L.Rev. at 64. Professor Winick goes on to point out that we do not need to rely on the inconsistency of the contention with the underlying constitutional policies at issue. Rather we can directly cite the U.S. Supreme Court in *Ballew v. Georgia,* 435 U.S. 223, 98 S.Ct. 1029, 55 L.Ed.2d 234 (1978)—an extremely important case in so many ways—as clear precedent against the state's contention. In *Ballew,* the effort was made to uphold a five-person jury in misdemeanor cases against an attack under the Sixth Amendment cross-section requirement. The Court invalidated the five-person jury because, *inter alia,* that size "pre-

vents juries from truly representing their communities...." *Id.* at 239, 98 S.Ct. at 1038. As Professor Winick observes:

No issue was raised concerning the representativeness of the jury pools from which Georgia selected five-person juries, or concerning the arbitrary exclusion of any particular class from five-person juries. Yet the Court noted that the absence of an equal protection problem did not dispose of "the question of representation," which combined with other factors created "a problem of constitutional significance under the Sixth and Fourteenth Amendments." If the cross-section requirement places limits on statutory reductions in jury size because resulting juries may not truly represent the community, then it should also be deemed to place limits on jury challenges which interfere with the representative character of resulting juries.

81 Mich.L.Rev. at 65 (footnote omitted). And of course, no one argues that it would be permissible under the Sixth Amendment to remove women or blacks by challenges for cause based solely on race or sex even though the pools or venires from which they were drawn were perfectly representative of the community. And, although *Witherspoon* was not overtly a "Sixth Amendment" case, there is language therein with respect to the necessity of *including* mildly scrupled jurors in order to make the jury representative at the penalty phase of the trial. And, obviously *all* scrupled jurors were represented properly in the pool of venires. So the vice there as here was the destruction of representativeness through the challenge-for-cause process.

So the petitioners have met the second test required by *Duren:* the representation of the excluded group after *voir dire* and the consequent challenges for cause, will not be fair and reasonable in relation to the number of such persons in the community. In fact, *no* representative of such group will remain after *voir dire.*

And it is apparent to all that this under-representation (zero representation) is "due to systematic exclusion of the group in the jury-selection process." *Duren,* 439 U.S. at 364, 99 S.Ct. at 668. So petitioners have established their prima facie case. The only remaining question is: has the state justified its insistence upon the use of the challenged procedure? The Court will turn to this question after dealing with the "guilt-proneness" issue.

However, before putting the "representative cross-section" issue behind us the Court will look at a *"Witherspoon"* argument that keeps cropping up despite the obviousness of the answer thereto. The argument is that the Supreme Court will never accept the petitioners' cross-section Sixth Amendment contentions because of the position it took in *Witherspoon* itself. There the Supreme Court clearly permitted the removal *at the penalty phase* of the very group whose removal at the guilt-innocence phase of their trials, petitioners now contend destroys the cross-section or representativeness of the jury in violation of their constitutional rights. The argument goes: If petitioners have a constitutional right to a representative jury at the guilt-innocence phase of their trial they also have a right to such a jury at the penalty phase. The Supreme Court recognized that those with adamant views against the death penalty may be removed at the penalty phase. Since the Supreme Court obviously would not countenance an "unrepresentative" jury at the important penalty phase of the trial, it follows that it concluded in *Witherspoon* that a jury without those adamantly opposed to the death penalty would still be a "representative" jury under Sixth Amendment standards. Ergo, the logic runs, such a jury would also be representative at the guilt-innocence phase.

It is not an adequate answer to simply state that *Witherspoon* was not a Sixth Amendment case. But there are two separate analyses that put such an argument to rest. First, the *Witherspoon* qualified jury at the penalty phase, considering its mission, is as representative as can be: It is composed of all of those, but only those, who can honestly swear that they are able and willing to try the penalty issue in ac-

cordance with law of the state and the evidence presented. If a prospective juror states "I don't care what the law or the evidence is, I will never vote for the penalty of death," i.e., if he is a Witherspoon Excludable, or if a prospective juror states, "I don't care what the law or the evidence might be, I will always vote to impose the death penalty for this type of crime," i.e., if he holds Automatic Death Penalty views, then neither will be able to conscientiously take the oath to serve as a juror who will be both fair to the defendant and fair to the state at the penalty phase. Both are therefore "nullifiers" in this context and are being excluded for the most traditional and accepted of all reasons: They cannot swear to try the issues presented upon the law and the evidence. They are not being removed because they are members of a group or class. The "bigamy-Mormon" example cited in the first *Grigsby* opinion comes to mind. If the Court states that it is its understanding that all Mormons believe that bigamy should not be considered a crime and, on that basis proceeds to exclude all who state they are Mormons, it would be committing error by excluding a religious class without justification. But if the Court asked each juror if he could try the charge of bigamy in accordance with the law and the evidence and all of the Mormons on the panel answered, "no," they could be properly excluded. But they would then be being excluded on the basis of their individual answers, not their group affiliation. Of course there might be one, more, or many Mormons who could honestly swear to put personal or religious values aside and to try the case on the law and the evidence. If so they should not be excluded. The *Witherspoon* death qualification rationale has implicit parallel considerations: not all prospective jurors who have scruples against the death penalty may be excluded at the penalty phase. Indeed, only those may be excluded who could never impose the death penalty, regardless of the evidence and the law, i.e., only those who could not conscientiously swear to try the penalty issue with a mind that is not already closed on that issue.

■ A second answer to such an argument would focus on the state's interest. The state has a strong and legitimate interest in having those penalty alternatives which have been established by its legislature considered by a jury that is capable of applying that law in a fair and impartial manner. This state interest can only be accommodated by permitting the removal for cause at the penalty phase of those who admit that they cannot try the penalty issues upon the law and the evidence. As stated in *Pierre v. Louisiana,* 306 U.S. 354, 358, 59 S.Ct. 536, 538, 83 L.Ed. 757 (1959):

> [T]rial by jury cease(s) to harmonize with our traditional concepts of justice at the very moment particular groups, classes or races—*otherwise qualified to serve* as jurors in a community are excluded *as such* from jury service.

(Emphasis supplied.)

III. *Denial of a Fair and Impartial Jury: Guilt Proneness of Death Qualified Juries.*

A. *Legal Principles and Terminology.*

■ No proposition is more fundamentally linked to our accepted notions of due process than that which declares that persons charged with serious crimes are entitled, as a matter of right, to trial by a fair and impartial jury. The litany which gives expression to that right is repeated in hundreds of jury cases daily throughout the nation. Indeed, the paramount objective of the entire *voir dire* process is to obtain a jury which will fairly and impartially try the issues of fact presented by the allegation in the indictment or information and the "Not Guilty" plea of the accused. This right arises from both the Sixth Amendment and the principles of due process. *Ristaino v. Ross,* 424 U.S. 589, 595 n. 6, 96 S.Ct. 1017, 1020 n. 6, 47 L.Ed.2d 258 (1976). To paraphrase *Witherspoon,* the decision whether a person is guilty or not guilty of a capital crime must be made on scales that are not tipped by state procedures toward guilt. *See* 391 U.S. at 521–22 n. 20, 88 S.Ct. at 1776 n. 20.

■ Any procedure which might predispose the trier of fact to convict violates due process. This principle was firmly established in *Tumey v. Ohio,* 273 U.S. 510, 47 S.Ct. 437, 71 L.Ed. 749 (1927), which involved a challenge to an Ohio statute, that empowered a village mayor to act as judge in trials of offenses against the state's prohibition laws, and that also entitled the mayor to recover $12 in costs if a defendant was convicted. The Court held the statute unconstitutional under the due process clause of the Fourteenth Amendment, even without a showing of actual prejudice. The court stated:

> Every procedure which would offer a possible temptation to the average man as a judge to forget the burden of proof required to convict the defendant, or which might lead him not to hold the balance nice, clear and true between the state and the accused denies the latter due process of law.

*Id.* at 532, 47 S.Ct. at 444.

The Court made it clear that even though the evidence showed that the defendant was clearly guilty, he was entitled to have an impartial trier of fact:

> No matter what the evidence was against him, he had the right to have an impartial judge.

*Id.* at 535, 47 S.Ct. at 445. *See also Connally v. Georgia,* 429 U.S. 245, 97 S.Ct. 546, 50 L.Ed.2d 444 (1977); *Ward v. Monroeville,* 409 U.S. 57, 93 S.Ct. 80, 34 L.Ed.2d 267 (1972).

The cases involving pretrial publicity are also pertinent since, in such cases, it is necessary to determine if information received preceding the actual presentation of evidence might impair the trier of fact's ability to assess that evidence in a fair and objective manner. In *Sheppard v. Maxwell,* 384 U.S. 333, 362, 86 S.Ct. 1507, 1522, 16 L.Ed.2d 600 (1966), the Supreme Court stated:

> [T]he trial courts must take strong measures to ensure that the balance is never weighed against the accused. And appellate tribunals have the duty to make an independent evaluation of the circumstances.

The objective is to prevent even the possibility of unfairness.

The majority in the Eighth Circuit *Grigsby* opinion directs this Court to resolve this issue: whether death-qualified jurors are more likely to convict than jurors selected without regard to their views on the death penalty. So the focus of our inquiry is upon the predisposition, if any, of death-qualified jurors. The Court now reviews the evidence bearing on this issue.

To deal with the pertinent empirical data it is necessary to settle upon some terminology, although neither legal scholars nor social scientists are fully in agreement thereon. The Court is here concerned with a spectrum of penalty preferences based upon differing attitudes toward the death penalty. Dr. Robert M. Berry in his article, *Death-Qualification and the "Fireside Induction,"* 5 U.Ark. Little Rock L.J. 1, 2 (1982) [hereinafter cited as *"Fireside Induction"*] has adapted the following useful table from the materials reported in *Hovey v. Superior Court,* 28 Cal.3d 1, 616 P.2d 1301, 168 Cal.Rptr. 128 (1980):

Penalty Preference Toward Guilty Defendants
for Different Death-Penalty Attitudes

| Attitude Toward Death Penalty | | | | |
|---|---|---|---|---|
| Automatic death penalty group | Favor death penalty group | Indifferent group | Oppose death penalty group | Automatic life-imprisonment group |
| will always vote for death | favors death penalty but will | neither favors nor opposes the | opposes or has doubts about | will always vote for life imprisonment instead |

Penalty Preference Toward Guilty Defendants for
Different Death-Penalty Attitudes—Continued

| Attitude Toward Death Penalty—Continued | | | | |
|---|---|---|---|---|
| penalty instead of life imprisonment | not vote to impose it in every case | death penalty | death penalty but will not vote against it in every case | of death penalty |

Prior to *Witherspoon* many states permitted the prosecution to remove "for cause" during the *voir dire* of capital cases all persons who opposed the death penalty in any degree.[5] *See, e.g., Williams v. State,* 32 Miss. 389, 392 (1856). This practice of "death qualifying" juries continued even when the guilt and penalty phases of capital trials were functionally separated. In the guilt phase the jury would determine the defendant's guilt or innocence. If it found the defendant guilty of the capital offense, the same jury would then decide whether to impose death or some other permissible penalty—usually life imprisonment. *See "Fireside Induction," supra* at 3.

In *Witherspoon* the Supreme Court determined that it was "self-evident" that juries formed by excluding all those who had "general objections to the death penalty" could not "speak for the community" and "were uncommonly willing to condemn a man to die." 391 U.S. at 518, 520, 521, 88 S.Ct. at 1775, 1776. The Court stated that only those "... who made unmistakably clear (1) that they would *automatically* vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial of the case before them, or (2) that their attitude toward the death penalty would prevent them from making an impartial decision as to the defendant's *guilt*", *id.* at 522–23 n. 21, 88 S.Ct. at 1777 n. 21, could be excluded for cause. Of course there was nothing new in the second proposition since anyone, even in non-capital cases, will be excused for cause

if, for any reason, he cannot swear that he will make an impartial decision on the guilt or innocence of the defendant. *See* discussion of "nullifiers" below. As a result of *Witherspoon* both those who are able to make an impartial decision on the defendant's guilt and those who are not are excluded from participating in that decision if they, on *voir dire,* express adamant opposition to the death penalty, i.e., if they would, at any later sentencing phase, "automatically" vote against the death penalty without regard to the evidence in the case. Jurors possessing such strong scruples against the death penalty are referred to as "*Witherspoon* Excludables" or "WEs." In terms of the above table they could also be referred to as the "Automatic Life Imprisonment Group."

In *Witherspoon* it was also argued that to exclude jurors with scruples against the death penalty (groups 4 and 5 above) in the guilt-determination phase, as was done in that case, would result in creating a "tribunal organized to return a verdict of death" thereby depriving the defendant of a representative jury as well as of an impartial jury. 391 U.S. at 521, 88 S.Ct. at 1776 (citing *Fay v. New York,* 332 U.S. 261, 294, 67 S.Ct. 1613, 1630, 91 L.Ed. 2043 (1947)).

The petitioner in *Witherspoon* attempted to persuade the Supreme Court on the basis of logic and intuition that those persons who expressed attitudes in favor of the death penalty would, as jurors, "favor the prosecution in the determination of guilt."

**5.** Arkansas practice was otherwise, however. *See* discussion of Arkansas law below.

He argued that "'no additional proof' beyond 'the facts ... disclosed by the transcript of the *voir dire* examination'" was needed to establish the unconstitutionality of a guilt determination by a death-qualified jury. *See* 391 U.S. at 517 n. 11, 88 S.Ct. at 1774 n. 11. In fact, the petitioner in *Witherspoon* expressly declined the "opportunity to submit evidence" on the guilt-proneness issue. It is true that at the appellate level the petitioner asked the Supreme Court to judicially notice summaries of some early social scientific research. More particularly, the Supreme Court was referred to: (1) W.C. Wilson, *Belief in Capital Punishment and Jury Performance* (1964) (unpublished manuscript, University of Texas) (2) F.J. Goldberg, *Attitude Toward Capital Punishment and Behavior as a Juror in Simulated Cases* (undated) (unpublished manuscript, Morehouse College) and (3) H. Zeisel, *Some Insights into the Operation of Criminal Juries* (Nov. 1957) (confidential first draft, University of Chicago), 391 U.S. at 517 n. 10, 88 S.Ct. at 1774 n. 10. The Supreme Court found this data "too tentative and fragmentary to establish that jurors not opposed to the death penalty tend to favor the prosecution in the determination of guilt." *Id.* Indeed, those data were very "tentative and fragmentary." The Supreme Court noted that in his brief, Witherspoon relied only upon the Wilson and Goldberg articles. The Zeisel fragment referred to in Witherspoon's petition for certiorari was apparently withdrawn.

The Supreme Court noted in *Witherspoon* that the items which it was asked to judicially notice had not been introduced into evidence or subjected to the fact-finding process. Therefore, the Court was left to: "... speculate ... as to the precise meaning of the terms used in the studies, the accuracy of the techniques employed and the validity of the generalizations made." *Id.* at 517 n. 11, 88 S.Ct. at 1774 n. 11. The Court ultimately refused to find, based upon the record or judicial notice, "that the exclusion of jurors opposed to capital punishment results in an unrepresentative jury

on the issue of guilt...." *Id.* at 517–18, 88 S.Ct. at 1774–75. By this determination the Supreme Court refused to adopt a *per se* guilt phase rule. Instead, it invited further study, leaving it open for future defendants to attempt to prove that juries death-qualified by *Witherspoon* standards were "less than neutral with respect to guilt." *See id.* at 518, 88 S.Ct. at 1775.

The petitioners in the case at bar have responded to the Supreme Court's invitation with a plethora of well-documented scientific research that does not suffer from the numerous deficiencies attributed to the research in *Witherspoon*. The manuscripts of the Zeisel and Goldberg studies, relied upon by petitioners here are thorough and complete, whereas earlier versions of those studies, which the Supreme Court reviewed in 1968, were both unpublished and incomplete. And the record establishes that the Supreme Court had only a five-to-eight page fragment of what became a fifty-page monograph by Dr. Zeisel. More importantly, this fragment did not include Dr. Zeisel's depiction and explanation of his data in what became Table 9 of that monograph.

As has been noted in the first *Grigsby* decision, the group excludable *after Witherspoon* (5 above) is a smaller subset of the group excluded in the *Witherspoon's* trial itself (4 and 5 above).[6] But the questions remained: (1) Are there among those in the group adamantly opposed to the death penalty (the WEs) persons who could fairly and impartially try the guilt/innocence issue if they did not have to participate in the sentencing phase, and (2), if so, does the exclusion of such persons deprive the defendant at the guilt phase of a representative jury (*see* discussion *supra*), or result in a jury that is more prone to convict than would be a jury from which such persons were not excluded?

The term "nullifier" is used to describe a prospective juror who states that he would be unable to try the issue of the defendant's guilt/innocence upon the basis of the evidence and the law. In the death-penalty context this is the person who would say, "I

---

**6.** But quaere? *See* the discussion of the use of peremptory challenges in capital cases, *infra*.

cannot vote a defendant guilty regardless of the evidence if I know that, should he be convicted, someone else [the court or some other jury] might impose the death penalty." These nullifiers are described in *Witherspoon* as those persons who make it unmistakably clear that their attitude toward the death penalty "would prevent them from making an impartial decision as to the defendant's guilt." *See* 391 U.S. at 513, 88 S.Ct. at 1772. It is, of course, agreed by all that "nullifiers" are properly excluded from both the guilt/innocence phase and the sentencing phase of a capital case. But it is urged that no proper reason exists for the exclusion of the impartial WEs at the guilt/innocence phase. For this reason they are sometimes referred to as "Guilt-Phase Includables."

Using this terminology all "*Witherspoon* Excludables" (WEs) may be divided into "Nullifiers" and "Guilt Phase Includables."

This court must decide on the basis of the evidence presented if there are differences, material to jury performance, between those qualified to serve under *Witherspoon* standards and those who are excluded by such standards.

### B. *The Evidence.*

Since 1968, the Zeisel and Goldberg studies have been completed and published. Both have been subjected to intensive peer review. In addition, to meet one of the objections stated by the Supreme Court, the petitioners here in *Grigsby* have offered extensive expert testimony explaining "the meaning of the terms used in" the Wilson, Zeisel and Goldberg studies which tend to verify the "accuracy of the techniques employed" and to demonstrate "the validity of the generalizations made." *See id.* at 517 n. 11, 88 S.Ct. at 1774 n. 11.

More importantly, however, petitioners have not only introduced the end products of the Wilson, Zeisel and Goldberg studies, but they have supplemented same with six more extensive attitude surveys, to wit, the four *Bronson* studies, the *Harris* 1971, and the *Ellsworth/Fitzgerald* 1979. In addition, seven more sophisticated conviction-prone-

ness studies were introduced, to wit, *Harris* 1971, *Jurow* 1971, and the five *Ellsworth* 1979 studies. In addition, the plaintiffs have introduced national and Arkansas-specific demographic data, as well as the *Haney* 1979 study (which suggested the ill effects of the *process* of death qualification) which were not raised or even suggested to the Supreme Court in *Witherspoon.*

The petitioners called three expert witnesses and three lay witnesses to testify during the hearing. They testified about their own studies and those of other social scientists referred to above.

### 1. *Petitioners' Expert Testimony.*

Petitioners' three experts were: Dr. Edward J. Bronson, Dr. Craig William Haney, and Dr. Reid Hastie. The Court was impressed with the professionalism of these experts, their candor, the quality and rigor of their own studies, and their careful and objective appraisal of the studies and work of other scholars who have dealt with the issues before the Court. A brief review of their qualifications is in order.

Dr. Bronson is a Professor of Public Law and Political Science at California State University at Chico. In addition to a B.S. and J.D. degrees, he holds a LL.M. degree from the New York University School of Law, and a Ph.D. in Political Science from the University of Colorado. As a social scientist, Dr. Bronson has worked with various officials of the criminal justice system including prison officials, law enforcement officers, and parole officers. He has conducted four studies on the relationship between persons' attitudes on the death penalty and their attitudes on other criminal-justice related issues. *See, e.g.,* Bronson, *Does the Exclusion of Scrupled Jurors in Capital Cases Make the Jury More Likely to Convict? Some Evidence from California,* 3 Woodrow Wilson J.L. (1981); Bronson, *On the Conviction Proneness and Representativeness of the Death-Qualified Jury: An Empirical Study of Colorado Venireman,* 42 Colo.L.Rev. 1 (1970).

Dr. Haney is a Professor of Psychology at the Santa Cruz campus of the University of California. He received a Ph.D. in psychology and a J.D. from Stanford University in 1978. In addition to research and studies in empirical research methodology (Dr. Haney has published numerous articles on research methodology), his substantive area of research has emphasized the relationship between psychology and the criminal justice system. He has conducted research on such subjects as plea bargaining, eye witness testimony, the effect of television on witness perception, the impact of imprisonment on personality, and the use of *voir dire* in criminal juries to seek and impart information to prospective jurors. In addition, Dr. Haney has written on the subject of the value of social science to the courts. He participated in a study for the National Science Foundation on the Supreme Court's use of social scientific data, and he is a teacher of this subject to judges in his capacity as a faculty member of the National Judicial College. He conducted an experimental study in 1979 on the effect on jurors of exposure to the process of death qualification during *voir dire*. He has also discussed how the exclusion of veniremen opposed to the death penalty affects the range of attitudes on death-qualified juries as well as the demographic composition of those juries. He has extensively reviewed the literature on death-qualified juries and has published a survey of the relevant literature. *See* Haney, *Juries and the Death Penalty: Readdressing the Witherspoon Question,* 1980 Crime & Delinq. 512.

Dr. Hastie is a Professor of Psychology at Northwestern University. He received his Ph.D. in psychology from Yale in 1973. He then joined the faculty of the Department of Psychology at Harvard and is currently an editor for the *Journal of Personality and Social Psychology,* and the *Journal of Experimental and Social Psychology.* His primary research emphasis has been on juries and the jury decision-making process. *See* Penrod & Hastie, *Models of Jury Decision Making: A Critical Review,* 86 Psych.Bull. 462 (1979); Penrod & Hastie, *A Computer Simulation of Jury Decision Making,* 87

Psych.Rev. 133 (1980); Pennington & Hastie, *Juror Decision-Making Models: The Generalization Gap,* 89 Psych.Bull. 246 (1981). Dr. Hastie's study of the jury system has spanned eight years and has been funded by grants from the National Science Foundation, the National Institute for Law Enforcement and Criminal Justice and James Marshall Foundation. He has conducted no specific research on the effect of the death qualification process, but testified about the work done by other scholars.

In his testimony Dr. Bronson discussed the empirical evidence developed by him and other researchers on the question of how death qualification affects the attitudes and demographic composition of the resulting juries.

Dr. Haney testified concerning the relationship between death penalty attitudes and other criminal justice related attitudes. He also discussed the effect of death qualification upon the demographic composition of the resulting juries. He was principally concerned with the effect of excluding persons opposed to the death penalty upon the likelihood of conviction. But probably his most important contribution was his testimony concerning his own experiments on the effect of the death qualification *voir dire* procedures themselves upon the jurors who survived the *voir dire* challenges.

Dr. Hastie reviewed the research upon the effect of death qualification and discussed the effect of death qualification upon the attitudinal and demographic characteristics of both jurors and juries. He compared the relative conviction proneness of death qualified with non-death qualified juries and discussed the effects of death qualification upon the quality of the jury deliberation and the accuracy of the resulting jury's factfinding.

During their case in chief the petitioners also presented one lay witness, Mr. Dale Enoch, president of Precision Research, Inc., of Little Rock, Arkansas, who reviewed a demographic study which his company conducted in Arkansas.

The petitioners introduced 270 exhibits which included social scientific research on death qualification, articles on jury decision making, and graphic displays of the results of the social science research.

All of petitioners' experts testified as to the relationship between death penalty attitudes and other criminal justice related attitudes. All agreed that the empirical evidence and data made it clear, in their professional opinions, that persons excluded by the process of death qualification share sets of attitudes toward the criminal justice system that set them apart and distinguish them collectively from those not excluded by that process. All were also of the opinion that death-qualified jurors are more prone to favor the prosecution, to be hostile to the defendant, to regard significant constitutional rights lightly, and to make adverse judgments concerning minority groups than persons who adamantly oppose the death penalty (i.e., are not "death qualified"). Petitioners' experts were convinced that death-qualified jurors differ systematically from those excluded under *Witherspoon* standards. They relied, *inter alia*, upon the following scientific studies, some of which will be discussed later on herein:

*Wilson, 1964*
*Bronson/Denver, 1970*
*Bronson/Butte, 1980*
*Bronson/Butte Followup, 1980*
*Bronson/Los Angeles, 1980*
*Goldberg, 1970*
*Harris, 1971*
*Ellsworth/Fitzgerald, 1979*

The Court credits and accepts the said opinions of petitioners' experts and finds that those opinions are based overall on solid scientific data, reason, and common sense.

### 2. *Representative Cross-Section Issue.*

The Court particularly notes with respect to the Sixth Amendment "distinctive group" issue [one of the "roadblocks" in the Court's first *Grigsby* opinion] that both the *Bronson/Denver, 1970* study and the *Bronson/Butte County, 1980* study provide cogent evidence that persons who strongly oppose the death penalty (WEs) differ in significant ways attitudinally not only from those who "strongly favor" and "favor" the death penalty *but also from those who "oppose" the death penalty.* The evidence shows that all three of the latter groups are much more likely than WEs to, among other things, disregard the presumption of innocence, to criticize the exercise of one's Fifth Amendment right to remain silent, to believe that courts are too concerned with protecting the rights of criminals, and to believe that the insanity defense is a loophole which allows the guilty to go free. As stated elsewhere herein, the Court finds that those excluded by death qualification are a distinct group and that no other of the death-qualified groups, not even those who hold milder scruples against the death penalty, can adequately represent their point of view or life perspective.

All three of petitioners' experts testified as to the relationship between death penalty attitudes and demographic characteristics. All three expressed the opinion that the process of death qualification has the inevitable effect of decreasing disproportionately and significantly the number of women and blacks eligible to serve as jurors at the guilt-innocence phase of capital trials. They based these opinions, *inter alia*, upon the following studies, all of which are in evidence:

*Bronson/Denver, 1970,*
*Bronson/Butte County, 1980,*
*Bronson/Los Angeles, 1980*
*Goldberg, 1970*
*Harris, 1971*
*Ellsworth/Fitzgerald, 1979*

and upon national opinion polls. The Precision Research, Inc. Arkansas demographic survey also supports those opinions.

The Court credits and accepts these opinions of petitioners' experts finding that the above studies provide strong support therefor. Taking the studies overall, the Court finds that the differences between the attitudes of blacks and whites with respect to the death penalty is highly statistically significant. For instance Dr. Bronson totalled the attitudes by race for his three studies

and found that only 5.8% of blacks strongly favor the death penalty while 30.4% oppose it. This compares with 20.4% of the whites who strongly favored the death penalty while only 9.9% strongly oppose it.

And the *Harris 1971* national demographic survey shows that, by virtue of their attitudes toward the death penalty, 46% of blacks would be excluded under the *Witherspoon* standard as compared with only 29% of the white subjects, a difference which is also highly statistically significant. And 37% of the women were WEs compared to only 24% of the male subjects.

The Arkansas "Precision Survey" used five death penalty positions on its spectrum: "strongly in favor," "somewhat in favor," "neither favor/oppose," "somewhat opposed," and "strongly opposed." Forty-five percent of Arkansas blacks indicated they were strongly opposed compared to 10% of the whites. Twenty-one percent of Arkansas women were strongly opposed compared to 8% of the men. The survey also indicated that even after excluding "nullifiers" 29% of the blacks would never impose the death penalty compared to 9% of the whites. And, whereas only 8% of Arkansas men would be *Witherspoon* Excludables (after removing "nullifiers"), 13% of Arkansas women would fall into that classification. These results are consistent with national surveys over the past 30 years. So it is clear that the death qualification procedures which permit the removal of fair-minded prospective jurors from the guilt-innocence determination phase of capital trials solely because of their attitudes toward the death penalty will indirectly but inevitably result in the underrepresentation of blacks and women on such juries in Arkansas.

Although the percentage figures differ in the various studies, all confirm the great difference in attitude between blacks and whites and between men and women on the death penalty. And even though such attitudes change back and forth over time the demographic differences referred to have steadily persisted and continue to persist.

Dr. Gerald Shure, the respondent's expert, apparently agrees that death qualification disproportionately excludes blacks. The State offered no credible evidence to the contrary.

Blacks and women constitute significant and distinctive groups of jury-eligible citizens within Arkansas and the Nation. Death qualification results in their systematic disproportionate removal from juries which try the guilt-innocence of persons accused of capital crimes, without adequate justification, in violation of the accused's right to a representative jury comprised of a fair cross-section of the community.

### 3. Conviction Proneness Studies.

All three of petitioners' experts testified concerning the "conviction proneness" of death-qualified juries. They testified that in their professional opinions "death-qualified" jurors (i.e., persons whose attitudes toward the death penalty qualify them to serve) are substantially more likely to convict a defendant charged with a serious crime than would be prospective jurors who are not qualified to serve because of their adamant opposition to the death penalty but who could, nevertheless, fairly try the guilt-innocence issue in capital cases.

Dr. Bronson based his opinion that death-qualified jurors are more prone to convict upon the amalgam of associated pro-prosecution attitudes which are shared by persons who strongly oppose the death penalty. He believes that such prosecution-prone attitudes are convincing predictors of the voting behavior of such persons when they are chosen to try the guilt-innocence of a person accused of a capital crime.

Dr. Hastie and Dr. Haney relied upon the attitudinal studies referred to above and also upon many other studies comparing the propensity of death-qualified and non-death-qualified jurors to convict. Among those studies they relied principally upon the following:

*Zeisel, 1986*

*Wilson, 1964*

*Goldberg, 1970*

*Jurow, 1971*

*Harris, 1971*

*Ellsworth et al, Conviction Proneness and Related Studies, 1979*

The last cited is a composite of several studies which includes *Ellsworth, Thompson and Cowan, Conviction Proneness Study* and *Related Studies by Ellsworth, Harrington, Thompson, Cowan and Bukaty.*

Professor Zeisel collected his data in 1954–55; Dr. Goldberg collected hers in 1967–68; and for the rest the data was collected in the years indicated for the report.

The Court credits the opinions of petitioners' experts on the guilt proneness of death-qualified juries, finding same to be based upon reliable empirical data, reason, and common sense.

Arkansas practice to the contrary, *see* below, before *Witherspoon,* death qualification in capital trials in most states worked differently. Commonly, all persons having scruples (even the slightest) against the death penalty were removed. So researchers during that period studied whether a jury composed by excluding all persons having death penalty scruples was more likely to convict than a jury composed of persons having no such scruples. *Zeisel 1968, Wilson 1964,* and *Goldberg 1970* relied upon data collected before *Witherspoon* and analyzed that data on the basis of the pre-*Witherspoon* legal test. Although it might be contended that these pre-*Witherspoon* studies are of limited relevance, the Court finds them to constitute a significant contribution to the overall scientific research in this area. The post *Witherspoon* studies are obviously more directed to the issue before the Court and benefit from greater sophistication, but, nevertheless, the direction and thrust of the earlier studies have been corroborated and reinforced by the later studies, all of such studies showing a remarkable degree of consistency in their findings.

### a. *Wilson 1964.*

In the *Wilson 1964* study, which utilized 187 Texas college students and 61 New York students, the subjects were given brief written descriptions of five criminal cases. They were also asked questions to determine which had scruples against the death penalty. The *Wilson* study was one of the first to show that persons without scruples against the death penalty are more likely to convict than people with such scruples. It also showed that non-scrupled "jurors" were more confident in their guilt determinations, would impose heavier penalties, and appeared more biased in favor of the prosecution. This study has its problems: it used college students as subjects; it concentrated on predicting the behavior of individual jurors, not juries; it did not take into consideration the possible effect of group deliberations; and it did not focus on the post-*Witherspoon* legal issue. But Wilson revealed the nexus between death penalty attitudes and conviction behavior.

### b. *Goldberg 1970*

The *Goldberg 1970,* reflecting studies made in 1966–67, obtained results consistent with, and in the same direction as, those found by Wilson. But that study is subject to many criticisms in addition to those levelled at Wilson, and its results cannot be said to be statistically significant.

### c. *Zeisel 1968*

The *Zeisel 1968* is a study of the voting behavior of persons who had actually participated in criminal felony trials in Chicago and Brooklyn. Professor Zeisel and his assistants contacted jurors present in the jury room at the end of the last day of their eligibility to serve and asked if they cared to be interviewed for a study on jury behavior. Approximately two-thirds agreed to participate. The stimulus used was a group of actual felony trials in Chicago and Brooklyn. The subjects were asked: (1) whether they had scruples against the death penalty; (2) if they had sat on a jury that actually deliberated in criminal cases; (3) if so, how did they vote on the first ballot; and (4) what was the vote of the entire panel of twelve on the first ballot.

Dr. Zeisel hypothesized that the general thrust of the evidence would be indicated by the number of guilty votes on the first ballot. He excluded unanimous first ballot votes since they would not reveal potential

differences. There remained 464 *split* first-ballot votes to analyze. To control for the strength of the evidence he divided these into eleven "constellations." One group would be the situation where the split ballot was 11:1 for guilt; the next 10:2; and, so forth until 1:11. He knew from his and other studies that the first ballot vote was an extremely accurate predictor of the final verdict. And he viewed it also as an accurate measure of the strength of the evidence. He then compared the voting behavior of the scrupled and non-scrupled jurors, within these eleven constellations. The results appear to support his concept concerning the strength of the evidence since the proportion of subjects voting guilty—whether scrupled or non-scrupled—turned out to be functionally related to the number of first ballot guilty votes.

Professor Zeisel's data showed that in nine out of the eleven "constellations" non-scrupled jurors voted to convict more often in cases of like evidentiary strength than scrupled jurors, and in ten out of eleven cases of like evidentiary strength scrupled jurors voted to acquit more often than non-scrupled jurors.

This study is fascinating because it accepts what lawyers and judges know intuitively: when the strength of the evidence is great enough "conviction-proneness" and "acquittal proneness" become non-issues. And split first ballot votes are good indicators of the strength of the evidence. Guilt proneness and acquittal proneness become more and more important as the strength of the evidence diminishes.

Looking at Table 9 of petitioners' Exhibit CH–5 one can see the difference between the proportion of scrupled and non-scrupled jurors voting guilty as a function of the strength of the evidence. At what evidentiary strength will scrupled and non-scrupled jurors reach the point of equal likelihood of voting guilty or not guilty? The answer appears to be when the vote is 4–8 (i.e., only 4 guilty votes) for the non-scrupled jurors and almost the reverse for the scrupled jurors. So non-scrupled jurors are at the "equal likelihood" point when the strength of the evidence is relatively weak whereas the strength of the evidence must be fairly strong before the scrupled juror reaches that point of equilibrium.

The *Zeisel* study was conducted by one of the leaders in forensic social science in this nation. Dr. Zeisel has been Professor of Law and Sociology at the University of Chicago since 1952. He is the co-author with Harry Kalven, Jr., of *The American Jury* (1966). His work has been cited and relied upon by the U.S. Supreme Court, the California Supreme Court and others. Since his study used actual trials and actual jurors it avoids some of the arguments (mostly unfounded) directed at the unreliability of simulation. So his work demonstrates that the significant differences between the conviction behavior of scrupled and non-scrupled jurors are not limited to simulated situations. Of course, that work did not focus on the narrower post-*Witherspoon* test since it was performed long before the *Witherspoon* decision.

The post-*Witherspoon* studies of the guilt proneness of death-qualified juries meet many of the criticisms of the earlier studies. First, they focus more precisely upon the correct issue. Second, the methodology has improved.

d. *Jurow 1971.*

*Jurow 1971* is a study of the effect of death qualification upon guilt determination. It was conducted by Professor George Jurow then on the faculty of City University of New York. He is both a lawyer and a psychologist. His work was funded by the Department of Justice's LEAA and is published as Jurow, *New Data on the Effect of a "Death Qualified" Jury on the Guilt Determination Process,* 84 Harv.L.Rev. 567 (1971). He used as subjects 211 employees of a Sperry Rand Corporation plant on Long Island. The sample was non-random, 99% of which were white and 80% of which were male. One third of the subjects had prior jury service. Professor Jurow had the subjects fill out the two-part Capital Punishment Attitude Questionnaire (CPAG) to determine attitudes toward the death pen-

alty and to assess how the subject would consider the death penalty if serving on a jury. The attitude questions and the percentage distribution of those choosing each attitude are as follows:

**Capital Punishment Attitude Questionnaire (CPAQ), Part B, and percentage distribution of subjects endorsing each alternative**

| Percentage Choosing | |
|---|---|
| 10% | 1. I could not vote for the death penalty regardless of the facts and circumstances of the case. |
| 20% | 2. There are some kinds of cases in which I know I could not vote for the death penalty even if the law allowed me to, but others in which I would be willing to consider voting for it. |
| 63% | 3. I would consider all of the penalties provided by the law and the facts and circumstances of the particular case. |
| 5% | 4. I would usually vote for the death penalty in a case where the law allows me to. |
| 2% | 5. I would always vote for the death penalty in a case where the law allows me to. |

Professor Jurow then asked the subjects to vote guilty or not guilty in two cases presented by audio-tapes. The first tape was thirty-three minutes long and involved the alleged murder of a liquor store proprietor during a holdup. The second was about an hour long and involved charges that a narcotic addict robbed, raped and killed a girl in her apartment.

After the subjects voted, Professor Jurow compared their voting behavior in relation to their death penalty attitudes. The results are as follows, with class 1 representing the *Witherspoon* -excludables:

**Relationship between Death-Penalty Attitude and Verdict**

| CPAQ–B Statement Endorsed | Number Voting Guilty | Number Voting Innocent | Within-Group Majority Vote |
|---|---|---|---|
| Class | | | |
| | | Case I | |
| 1 | 7 | 14 | 67% Acquit |
| 2 | 12 | 30 | 71% Acquit |
| 3 | 59 | 73 | 55% Acquit |
| 4 | 10 | 1 | 91% Convict |
| 5 | 4 | 1 | 80% Convict |
| | | Case II | |
| 1 | 9 | · 12 | 57% Acquit |

**Relationship between Death-Penalty Attitude and Verdict**

| CPAQ–B Statement Endorsed | Number Voting Guilty | Number Voting Innocent | Within-Group Majority Vote |
|---|---|---|---|
| Class | | | |
| 2 | 25 | 17 | 60% Convict |
| 3 | 76 | 56 | 57% Convict |
| 4 | 9 | · 2 | 82% Convict |
| 5 | 4 | 1 | 80% Convict |

In Case I he found that the stronger the subject's views were in favor of the death penalty the more likely that subject would vote to convict. He found the same relationships in Case II but the differences in Case II were not statistically significant.

Even though Jurow was looking at juror behavior, rather than *jury* behavior, his study provides additional probative evidence of the relative tendency of death qualified jurors to convict, a result which is consistent with those of prior studies.

None of the above studies employed a random sample of subjects. Random samples are necessary if the object is to determine the incidence of certain characteristics in a given population. But they are not necessary in studies used to compare the behavior of people with different characteristics.

e. *Harris 1971.*

The *Harris 1971* study did employ a random sample of subjects. It was conducted by Louis Harris and Associates. The results in part were published in White, *The Constitutional Invalidity of Convictions Imposed by Death-Qualified Juries,* 58 Cornell L.Rev. 1176 (1973). The full *Harris* report has been introduced into evidence and reviewed by petitioners' expert witnesses.

The subjects of the *Harris* study consisted of a stratified national probability sample composed of 2,068 adults drawn from the "lower forty-eight" states (all except Alaska and Hawaii). Fifty percent were women. Seventeen percent were black or other minorities.

Each Harris subject was interviewed personally in his or her home. Each was asked certain attitudinal questions including

whether, in a murder trial, "there would be any situation in which you might vote for the death penalty, or do you think you could never vote for the death penalty, regardless of the circumstances?" This question adequately identified the *Witherspoon* Excludables. The study used four criminal case descriptions as the stimuli, preceded by a set of general instructions intended to be like those which a court would give in a criminal trial, touching on such subjects as burden of proof, the reasonable doubt standard, the defendant's right not to testify and the juror's duty to apply only the legal definition of the crimes charged. The subjects were asked to vote guilty or not guilty on each of the four cases. The results are graphically depicted as follows:

1971 HARRIS POLL
PERCENT VOTING GUILTY IN FOUR CASES
(BY DEATH-QUALIFIED/EXCLUDABLE)

AVERAGE FOR ALL CASES

*Subjects who replied that they could vote for the death penalty in response to the question on p. 5.

**Subjects who replied that they could never vote for the death penalty in response to the question on p. 5.

In all four cases death qualified jurors voted to convict more often than *Witherspoon* Excludables. In the first three cases the difference was highly statistically significant (p. .01). In the last case the difference was only marginally significant. Overall, death qualified jurors voted to convict in 63% of the cases as compared to 56% by *Witherspoon* Excludables.

Even though it did not examine the effect of jury deliberations, the *Harris 1971* study provides additional convincing evidence that death qualified juries are conviction prone.

Both *Jurow* and *Harris* lacked one necessary refinement. As pointed out above, *Witherspoon* Excludables include "nullifiers" who, everyone agrees, may be removed at both the penalty and the guilt-innocence phases of capital trials. Since they could not in any event serve, the Harris-Jurow tests might be considered too inclusive to indicate whether a subset of *Witherspoon* Excludables, described above as "Guilt Phase Includables," differ in conviction behavior from those who are death qualified. The comparison needs to be made between death qualified (i.e., jury eligible subjects) and WEs, excluding nullifiers. Which brings us to the study by Phoebe Ellsworth and her colleagues.

f. *Ellsworth 1979.*

*Ellsworth 1979* is made up of five studies undertaken by Dr. Phoebe Ellsworth and

her colleagues Dr. Joan C. Harrington, Dr. William Thompson, Dr. Claudia Cowan and Raymond M. Bukaty in 1979. The studies were designed to replicate the results of earlier studies using more sophisticated experimental and control techniques and to attempt to gain some insight into the reasons that death-qualified jurors might be more conviction prone than non-death qualified jurors who could fairly try the issue of guilt-innocence in capital trials.

The transcript of Dr. Ellsworth's testimony in the *Hovey* case was received in evidence here. Dr. Haney relied upon that transcript together with the studies themselves for the purpose of explaining the full thrust and effect of those studies. It will be recalled that the California Supreme Court found Dr. Ellsworth's work very persuasive.

The subjects of the five *Ellsworth* studies were all drawn from the same panel of 288 adult, jury-eligible citizens in Santa Clara and San Mateo counties in California. They were recruited by using a jury list from the local court and by advertising for volunteers. Forty-five percent had prior jury service. Each subject was read an introductory statement and was asked to assume that he or she was a prospective juror in a criminal case being questioned by a judge. The statement explained the bifurcated process by which capital trials are presently conducted in this country. Each was then asked the following question:

Which of the following expresses what you would do if you were a juror for the first (guilt/innocence) part of the trial?

a. I would follow the judge's instructions and decide the question of guilt or innocence in a fair and impartial manner based on the evidence and the law

or

b. I would not be fair and impartial in deciding the question of guilt or innocence, knowing that if the person was convicted he or she might get the death penalty.

Those who chose (b) were then excluded from participation in any of the studies. This eliminated the "nullifiers," leaving only those who could sit as impartial jurors at the guilt-innocence phase of capital trials.

The subjects were also inquired of as follows:

The judge will ask you this question: Is your attitude toward the death penalty such that as a juror you would never be willing to impose it in any case, no matter what the evidence was or would you consider voting to impose it in at least some cases?

a. I would be unwilling to impose it in any case.

b. I would consider voting to impose it in some cases.

The answers identified the *Witherspoon* Excludables, or, more precisely, the "Guilt Phase Includables" (since the nullifiers had already been removed) on the one hand and identified those who were death-qualified on the other hand. With this information Dr. Ellsworth and her colleagues were able to compare the voting behavior of the subjects in all five studies. The final sample was composed of 258 death-qualified subjects and 30 WEs.

The *Ellsworth* studies did not use random sampling techniques. In fact they often restricted the number of WEs so that, in the deliberation studies, simulated juries could be composed of differing percentages of WEs, i.e., so that such 12-person juries could have 0, 1, 2, 3 or 4, but not more than 4 WEs.

Since random techniques were not employed no claim is made that it is possible to generalize from the numbers of WEs and death-qualified in the subject pool to the population at large.

In the *Ellsworth Conviction Proneness Study 1979*, hereinafter *ECPS 1979*, the stimulus used was a 2-hour videotape re-enactment of an actual murder trial in Massachusetts. It was prepared by Dr. Hastie for use in his own work and was loaned to Dr. Ellsworth for her study. She revised it somewhat and substituted California jury instructions. The tape included opening statements, the direct and cross-examina-

tion of seven witnesses, closing arguments and one-half hour of jury instructions. It was filmed in a Massachusetts courtroom using a judge, a prosecutor and a defense attorney to portray those same roles in the film. Probably no simulation, even of an actual trial, will be completely satisfactory to an experienced judge or lawyer. But the Court finds this videotape to be a high quality and realistic stimulus. The tape is in evidence in its entirety.

After viewing the videotape each subject was asked to vote for one of four verdicts: (1) guilty of first degree murder, (2) guilty of second degree murder, (3) guilty of voluntary manslaughter, or (4) not guilty by reason of self-defense or excusable homicide. The results were as follows:

ELLSWORTH CONVICTION-PRONENESS STUDY

DISTRIBUTION OF INITIAL VERDICTS
(BY DEATH-QUALIFIED/EXCLUDABLE)

It will be seen that most voted for manslaughter or acquittal. Few voted for first or second degree murder. Among these there were no significant differences but when the manslaughter and not guilty votes are considered the typical pattern emerges. About half of the death-qualified jurors voted to convict of manslaughter while only approximately one-fourth of the *Witherspoon* excludables so voted. Put another way 46.7% of WEs voted to acquit as compared with 22.1% of the death-qualified.

Considering only guilty and not guilty votes this study shows a 25% greater guilty vote by death-qualified subjects compared to WEs (77.9% versus 53.3%). Note the following graph:

ELLSWORTH CONVICTION-PRONENESS STUDY
PERCENT VOTING GUILTY
(BY DEATH-QUALIFIED/EXCLUDABLE)

Dr. Ellsworth then proceeded to determine the effect that systematic exclusion of WEs would have on the number of not guilty votes in a case such as that portrayed. She assumed that 17.2% of the jury eligible population would be made up of WEs. The Court finds this to have been a valid assumption based upon the attitudinal surveys. She then determined that such systematic exclusion would result in 31% fewer initial votes to acquit. Using the accepted and familiar method of multiple regression (so frequently used in racial discrimination cases), Dr. Ellsworth excluded other possibly relevant factors that might arguably account for such differences, e.g., age, gender, area of residence, or prior jury experience. This study provides strong evidence for the opinion, so often expressed by petitioners' experts, that death penalty attitudes are a far better predictor of juror voting behavior than any other single characteristic.

The results of this study are significant and demonstrate that persons who are death-qualified by *Witherspoon* standards are substantially more likely to vote to ac-

quit than are persons excluded by those standards. This study marks the culmination of some fifteen years of research demonstrating the divergent juror voting propensities of death-qualified versus excludable jurors.

Can the behavior of *juries* be predicted from the results of studies revealing the attitudes and voting behavior of individual *jurors*? Dr. Hastie answers this in the affirmative, basing his opinion in part upon the findings of Hans Zeisel and Harry Kalven in *The American Jury*. One of those findings, based upon extensive empirical investigation, is that the first ballot preferences of a majority of jurors in a given case is the single most accurately predictive factor in determining the final verdict outcome by that jury. Since first ballots are frequently taken prior to any extensive jury deliberations, the attitudes which each juror brings to the jury room turn out to be very important in explaining the differences that surface upon the initial ballot. The evidence shows that there is a strong propensity for *initial majority* verdicts to be the same as the *final unanimous* verdict. Therefore, studies of individual juror attitudes provide reliable information about final jury verdicts.

Dr. Hastie's own studies also support his opinion. His research shows that "initial faction size" constitutes the best predictive factor in determining final verdict outcomes, i.e., the verdict initially selected by the largest faction will most likely become the jury's final verdict. So the extent of initial agreement, prior to jury deliberation, is most often decisive of the final outcome.

The Court finds that the systematic exclusion of WEs from capital juries will reduce the number of cases with an initial majority, or largest faction, in favor of acquittal or in favor of a lesser included offense and will thereby substantially lessen the likelihood of acquittal and the likelihood of a vote of guilty to a lesser-included offense when the final unanimous jury verdict comes in.

The other four *Ellsworth* studies (post-deliberation, credibility, "regret" and insanity defense) were intended to go beyond simply revealing whether death-qualified jurors are more likely to convict. Those studies attempt to also determine *why* such divergent voting patterns occur.

Immediately after viewing the videotape and voting, 228 of the 288 subjects participated in another study to determine the effect of jury deliberations on juror voting behavior. The subjects were divided into nineteen 12-person juries and told to deliberate toward a verdict for one hour. Approximately one-half of the juries were fully "death-qualified." The other half were "mixed," each with up to four, but not more than four, WEs. Dr. Ellsworth limited the number of WEs to four or less in order to realistically reflect the likely makeup of juries on the assumption that WEs would comprise between 10% and 20% of the population, a valid assumption.

After one hour of deliberations, Dr. Ellsworth and her colleagues called a halt and asked the subjects to fill out another verdict form, a memory test (concerning facts revealed at the videotape "trial") and a questionnaire in which the subjects rated the credibility of the seven witnesses who testified during that "trial".

The Court is convinced, and so finds, that whereas the effect of jury deliberations can never be predicted in any particular case, it is possible to simulate realistic jury deliberation and to study scientifically the effect of jury deliberations on juror voting behavior.

Although there were some unexplained lost subjects, the study revealed the same voting pattern, based upon death penalty attitudes, after deliberations as before. Death-qualified subjects voted to convict between 20% and 25% more often than non-death qualified subjects. These results are significant and show that, on a statistical basis, jury deliberations do not completely wipe out or neutralize the voting propensities of individual death-qualified or excludable jurors.

Another finding made by Dr. Ellsworth which accords with intuitive common sense is that subjects who sat on "mixed" juries remembered the facts more accurately than subjects serving on juries composed of only death-qualified persons. This finding reinforces the legal requirement that juries reflect as nearly as possible a cross-section of the community and the variety of ideas, attitudes and opinions that exist therein. It is true that this will create a greater probability of argument and friction within such a jury, but, according to the evidence, logic and common sense, it also creates the likelihood of verdicts more accurately based upon the law and the evidence assuring as it does more vigorous and robust deliberations.

### g. *Haney 1979.*

In 1979 Dr. Haney conducted a study of the effects of the death qualification *voir dire* process on jurors who survive that process and thereby go on to serve on capital juries.[7]

Dr. Haney's work adds an entirely new and different dimension to the problem. Since the results of his study appear to confirm the "gut" opinions of those who daily operate in the courtroom environment it is important to review it even though no one contends that social science research on that problem is other than in its infancy.

The subjects of Dr. Haney's study were 67 jury-eligible adult men and women from Santa Cruz, California. He screened all prospective subjects and excluded those who (1) were not jury-eligible, (2) could not

---

7. Respondent argues that this issue is barred by *Wainwright v. Sykes,* 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1972), because, it is asserted, petitioner did not ask that the jury not be voir dired at all pursuant to *Witherspoon.* But it is clear that both Mr. Grigsby and Mr. McCree asked that prospective jurors who would under no circumstances vote for the death penalty not be excused for cause at the guilt-innocence phase of their trials. If the motion had been granted there would have been no death-qualification process beyond that permitted to identify nullifiers under Section 43–1920, Ark. Statutes. *See* discussion of Arkansas law and of restrictions on *voir dire* herein.

be fair on the issue of guilt (nullifiers) in capital cases, and (3) those who stated they could not impose the death penalty under any circumstances (WEs). He then used two videotapes as his stimuli. Half of the subjects viewed one tape; half viewed the other. The first portrayed a two-hour *voir dire* of prospective jurors, one-half hour of which was devoted to the death-qualification process. The second videotape was identical to the first except that the death qualification part was eliminated. Both tapes are in evidence.

Subjects were assigned to the two groups on a random basis. Both groups were told to assume that they were jurors participating in a real *voir dire*. They were then asked certain questions.

The results of the *Haney 1979* study showed that jurors exposed to the process of death qualification during *voir dire,* simply by virtue of that exposure, as compared to subjects not exposed to that process, are (1) more predisposed to convict the defendant, (2) more likely to assume before the trial begins that the defendant will be convicted and will be sentenced to death, and (3) more likely to assume that the law disapproves of persons who oppose the death penalty and (4) more likely to assume that the judge, the prosecutor *and the defense attorney* all believe the defendant to be guilty and that he will be sentenced to die and (5) are themselves far more likely to believe that the defendant deserves the death penalty. Such findings were convincingly explained by recognized psychological principles.

One of the principal objectives lawyers have in wanting to *voir dire* the jury is to open up channels of communication, to start the process of persuading the jurors before they have even been selected and before any evidence has been introduced. If lawyers perform their adversarial and partisan roles on behalf of their clients their highest priority will be to obtain a jury which is

*partial* to their client. An "impartial jury" might be their second choice, but, if they are performing their duty to their clients, they will, under accepted professional standards, be seeking to prevent the impaneling of jurors they believe will be partial to their adversary and at the same time they will be seeking the impanelment of persons who they believe will be favorable to their clients. Only one person in the courtroom is charged with the direct responsibility of insuring the selection of a truly fair and impartial jury, and that is the judge. The controversy rages over the appropriate roles of the judge and the lawyers in the conduct of the process of *voir dire.* But one thing is clear: The process has its own effects. The process communicates attitudes and ideas to the prospective jurors. The process is a means of communicating and informing. The communications inherent in the process can be very positive or very negative on jury performance. Properly utilized, *voir dire* will reveal the information needed by the court, the lawyers and their clients to determine the existence of the predicate for any proper challenge for cause. It can also serve to enhance and inform the sense of duty and responsibility which each juror will feel and to emphasize that the objective of the process is, indeed, a fair and impartial jury.

The death-qualification process traps the participants into the necessity of communicating false cues to the jury. It is natural for prospective jurors to look to the participants, and particularly to the judge, for information about the case and what their duties and responsibilities will be.

By focusing on the penalty before the trial actually begins the key participants, the judge, the prosecutor and the defense counsel convey the impression that they all believe the defendant is guilty, that the "real" issue is the appropriate penalty, and that the defendant really deserves the death penalty.[8] The process desensitizes

---

8. The spectacle of *the defense attorney* being forced to lead and cajole a prospective juror who has expressed adamant opposition to the death penalty in order to prevent him from

being "witherspooned" off the jury is striking: "Mr. A, don't you know that under some set of facts you could consider imposing the death penalty? Certainly if the evidence is bad

jurors to the gravity of their pre-penalty-phase duties. The experts have testified that a person's imagining of an event and publicly affirming one's commitment to it ("I could impose the death penalty") increases the likelihood that that person will allow that event to occur.

On each of the 16 questions posed by Dr. Haney to his two groups of subjects, the group that viewed the death qualification *voir dire* process gave more prosecution-prone answers and less defense-prone answers than did the group which did not see the death qualification *voir dire* process.

So, independently of the compositional effects of *voir dire,* and in addition thereto, the process itself increases the likelihood that the jury which ultimately sits will be more likely to convict than that same jury absent its exposure to that process. The process itself predisposes the "surviving" jurors to convict. The sequestration of prospective jurors is no solution according to Dr. Haney, because sequestration would only enhance such process effects in the juror's mind by allowing more time and attention to be spent focusing on the death penalty. And it is well known that, even without sequestration, death-qualification *voir dire* may take days or weeks in a capital case.

So, the predisposition of a death-qualified jury results from the compositional consequence of the process and also from the process itself. To summarize, death qualification skews the predispositional balance of the jury pool by excluding prospective jurors who unequivocally express opposition to the death penalty. The evidence, and particularly the attitudinal surveys discussed by Drs. Bronson and Hastie, clearly establishes that a juror's attitude toward the death penalty is the most powerful known predictor of his overall predisposition in a capital criminal case. That evidence shows that persons who favor the death penalty are predisposed in favor of the prosecution and are uncommonly predisposed against the defendant. The evidence shows that death penalty attitudes are highly correlat-

ed with other criminal justice attitudes. Generally, those who favor the death penalty are more likely to trust prosecutors, distrust defense counsel, to believe the state's witnesses, and to disapprove of certain of the accepted rights of defendants in criminal cases. A jury so selected will not, therefore, be composed of a cross section of the community. Rather, it will be composed of a group of persons who are uncommonly predisposed to favor the prosecution, a jury "organized to convict."

As pointed out the *Haney* study provides strong empirical support for what trial lawyers and judges already know, and that is, that regardless of the preconceptions which a juror might have before entering the courtroom, the questions and the answers and the dialogue pursued in the death qualification process have a clear tendency to suggest that the defendant is guilty. Death qualification, then, is comparable to saturating the jury pool with prejudicial pretrial publicity, which, as we know, is unconstitutional. *See Rideau v. Louisiana,* 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963); *Irvin v. Dowd,* 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961); and *Marshall v. United States,* 360 U.S. 310, 79 S.Ct. 1171, 3 L.Ed.2d 1250 (1959). But the death qualification process is worse because the biasing information is transmitted to the prospective jurors *inside the courtroom* and is imparted, albeit unconsciously, not only by the attorneys *but also by the judge.* The reading of the *voir dire* transcripts in these cases makes this abundantly clear—so clear that the Court suggests that even without the strong empirical support of the *Haney* study, the Court could conclude on its own that a reasonable limitations on such *voir dire* procedures would be appropriate. Judges of our trial and appellate courts are qualified and able to assess the prejudicial effect of a questioning process employed during *voir dire.* They should, by training and experience, be considered to possess some expertise on the effects of courtroom procedures, such as *voir dire,* which they observe almost daily either directly or

enough you would be able to follow the law by

considering imposing death?"

through review of transcripts from state and federal courts. Of course, it is reassuring to have the support of empirical data from qualified social scientists. But the determination of just what is fair procedure, constitutionally, falls within the ken of the judiciary.[9]

### III. The Automatic Death Penalty (ADP) Issue.

The Respondent State of Arkansas relies heavily upon the testimony and the studies of Dr. Gerald H. Shure particularly with respect to the impact and significance of the "Automatic Death Penalty" issue.

In *Hovey v. Superior Court,* 28 Cal.3d 1, 616 P.2d 1301, 168 Cal.Rptr. 128 (1980), the court noted that under California practice prospective jurors may be challenged for cause in capital cases not only if they are adamantly opposed to the death penalty, i.e. are *Witherspoon* Excludables (WEs), but also if they would always vote for the death penalty if the defendant were convicted, regardless of the evidence. The latter group of prospective jurors have become known as "Automatic Death Penalty" jurors (ADPs). *See* Table in Section II, *supra.* Although the California court appeared impressed with the studies and the evidence concerning the guilt proneness of *Witherspoon* Excludables (WEs), that court concluded that such studies were essentially irrelevant to the death qualification practices in California.

Here the State of Arkansas argues that the practice in Arkansas is like that in California in that it permits the elimination of both WEs and ADPs in capital cases. And it urges that none of petitioners' studies adequately takes this into consideration.

Petitioners first contend that this is a non-issue in the cases before the court because (a) in Grigsby's case, his trial attorney attempted to determine if any of the prospective jurors were ADPs but, upon objection of the prosecutor, was denied that opportunity, and (b) in the trials of Hulsey and McCree no ADP questions were asked and no prospective jurors were excluded for cause on that ground. Although it appears to the Court that at the time of the trials of the petitioners neither defense counsel, prosecutors nor trial judges in Arkansas were fully aware of the "flip-side" of *Witherspoon* and consequently rarely if ever made inquiry to identify ADPs, still the law of Arkansas does, and did at the time of petitioners' trials, permit the ADP challenge despite the fact that it has been rarely used or understood.[10] Furthermore it does not appear that Grigsby made the Court's denial of his right to identify and exclude ADPs an issue on his direct appeal, and, of course, it does not appear that in the cases of Hulsey or McCree defense counsel sought, but were denied, such an opportunity.

Assuming that the ADP issue is before the court, it is important to point out that here, as contrasted with *Hovey,* the ADP issue has been directly confronted by the parties as to its relevance and its merits.

The defense in *Hovey* contended that the size of the ADP group was so small that its presence would not significantly alter the effect of removing the much larger WE group. But the Court there had no reliable data upon the basis of which it could make

---

9. The prejudicial effect of certain types of voir dire questioning has long been recognized by the courts without the aid of social scientific data. For instance, no one would argue with the notion that asking potential jurors detailed questions about their views on liability insurance and insurance companies would prejudice the rights of the defendant in the standard personal injury lawsuit. One prejudicial effect is obvious. The jury's attention is diverted from the primary threshold question of liability to the secondary question of who will satisfy the judgment. So the courts have traditionally placed limits on voir dire to prevent obvious prejudice. And, of course, while fair practice should be required in every case, civil and criminal, no proceeding should be more carefully monitored than capital trials. For suggestions on appropriate limits on voir dire, *see* section on "The Peremptory Challenge Problem and Proper Limits on Voir Dire," below.

10. The Court so states with some hesitation. *See* discussion of Arkansas challenge law below.

an informed judgment as to the size of the ADP group. So the Court in *Hovey,* like the United States Supreme Court in *Witherspoon,* did not feel that it had adequate empirical data before it to permit it to deal with the important constitutional issues at stake.

The State of Arkansas here, like the State of California in *Hovey,* i.e., the representative of the prosecution, has chosen to tender the ADP issue. It is important to first note the underlying inconsistency in arguing that the removal of WEs will not result in a jury more prone to convict and then arguing that such removal of WEs will not result in a jury more prone to convict *if* the defense is permitted to remove the Automatic Death Penalty group. In other words, the State, by embracing the ADP issue, has effectively conceded the validity of the a priori, intuitive, gut feelings of all who actively and routinely participate in jury cases in nisi prius courts—the "fireside induction"—that WEs are acquittal prone and ADPs are conviction prone. So prosecutors, like defense counsel, albeit with some mild protests, know intuitively that this is so. More direct acknowledgment of this assumption may be found in the state's arguments and the courts analysis in such cases as *People v. Ray,* 252 Cal.App.2d 932, 61 Cal.Rptr. 1, *cert. denied,* 393 U.S. 864, 89 S.Ct. 145, 21 L.Ed.2d 132 (1968), wherein the state argued that the inclusion of jurors opposed to the death penalty would result in an acquittal-prone jury (i.e. at the guilt-innocence trial) and *Spinkellink v. Wainwright,* 578 F.2d 582 (5th Cir.1978), criticized elsewhere herein, and, indeed, in the dissent in the Eighth Circuit's decision in *Grigsby.* So here we find the state; on the one hand, implicitly accepting that ADPs are conviction-prone while challenging all of the research studies and empirical data which supports petitioners' contention that a juror's tendency or willingness to convict or acquit is linked to his or her attitude toward the death penalty.

Before dealing with the effect of removing both WEs and ADPs on the conviction proneness of the resulting juries, it is important to note the effect thereof on the representativeness of the resulting juries. Clearly, permitting the removal of the ADPs has an additional negative effect here by reducing even further the attitudinal diversity of resulting juries. (*See* discussion elsewhere herein on the appropriate definition of jury "neutrality" taking into consideration the historic "democratic" function of juries under our Constitution.) Dr. Shure conceded this effect during his testimony. And, by reducing the range of views and by decreasing counterbalancing attitudes, the effect will be to adversely affect the vitality, quality and reliability of jury deliberations. *See Ballew v. Georgia,* 435 U.S. 223, 98 S.Ct. 1029, 55 L.Ed.2d 234 (1978).

And before addressing the effect of removing ADPs on the conviction-proneness issue the Court also notes its effect on the biasing tendency of the *voir dire* death-qualification procedures themselves as testified by Dr. Haney. Clearly, if additional questioning during *voir dire* is permitted to identify ADPs, the jurors' attention is further focused on the penalty phase before the guilt-innocence trial has even commenced. This tends to induce the belief and expectation that the penalty phase is really the only issue and that the defendant will surely be convicted. By further inducing the jurors to assume the guilt of the defendant and to analyze their personal feelings about possible penalties, the additional inquiries needed to identify and remove ADPs will add to and reinforce the negative effects of permitting the *voir dire* questioning needed to identify and remove WEs.

And it bears repeating again and again that petitioners contend that *neither* ADPs or WEs should be removed during the guilt-innocence phase of the trial assuming they can honestly swear to try the issue of the defendant's guilt-innocence upon the law and the evidence. By the same token they readily concede that *both* should be removed at the penalty phase of the trial if the state is seeking the death penalty. The state's position is that both groups should

be removed from *both* phases of capital trials.

What is the effect of the respondent's evidence on the conviction-proneness issue? Dr. Shure, a professor of psychology and sociology at U.C.L.A., was the state's principal witness. His educational credentials are excellent and he has obviously had broad experience in computer assisted research and large scale simulations (for the Air Force). He has studied the effects of communication channels in problem solving, bargaining and negotiation, and pacifist behavior. He has participated in complex gaming studies for the Joint Chiefs of Staff and the State Department and has developed a computer assisted telephone interview system which has been of interest to the Census Bureau. But his interest and experience in the behavior of juries has been relatively limited. At the time he testified he had performed only one study but he had reviewed the literature extensively. He had testified on the issues we are concerned with about eight to ten times starting in August of 1979.

Dr. Shure found a consistent pattern in the findings of the studies tendered by petitioners. He felt those studies "made sense." He agreed that associated ideas do form a pattern. Taken as a whole he would not argue with the findings of those studies per se. However, he wondered what would be the effect of the introduction of other factors. Although Dr. Shure has made some reasonable criticisms and suggestions concerning the possibility of improving research techniques and better interpretation of existing studies, he has not, in his general comments, successfully impeached the clear thrust and effect of petitioner's case. In many ways his testimony reinforces that of the petitioners' experts. The one area that should be dealt with specifically, however, is his ADP study.

Dr. Shure conducted a telephone survey in an area around West Los Angeles using 20 professional interviewers each contacting 20 subjects for a total of 400. Less than one dozen of these subjects had had prior actual jury service. After removing the "nullifiers," 369 remained. On the basis of the answers to questions used by Ellsworth, Dr. Shure classified 310, or 84%, as death qualified and 59, or 16%, as Witherspoon Excludables. [It is interesting to note in passing that his figure on the percentage of WEs is consistent with that found in many of the other studies.] Through the use of further questions, Dr. Shure reclassified the sample as follows: 84, or 22.8%, WEs; 123, or 33.3%, ADPs; and 162, or 43.9%, death qualified under California law. The ADPs result "amazed" Dr. Shure. It is so far out of line with all of the other evidence in this case that a further analysis is indicated.

The key question used by Dr. Shure in reclassifying his subject-respondents was whether they would vote for the death penalty in the following specific, although hypothetical, case: A drug addict allegedly broke into an apartment where a female college student and her boyfriend were studying. The defendant allegedly shot and killed the boyfriend and then raped the girl and shot her in the head five times. Despite this she lived although she was paralyzed, mute and partially blind.

It is clear that Dr. Shure did not follow the *Witherspoon* approach in attempting to identify ADPs. He did not inquire if the prospective juror would always vote for the death penalty if a defendant were convicted of the capital crime, regardless of the evidence. Rather the "juror" was asked if he would vote the death penalty in a specific, heinous case.

Dr. Shure's study stands alone in the identification of such a high percentage of ADPs. The highest such percentage generated by other studies is around 2% and most studies fix the percentage at 1% or under. *See* Jarrow, *New Data on the Effect of a Death 'Qualified' Jury on the Guilt Determination Process,* 84 Harv.L.Rev. 567 (1971) (2%); The 1981 Harris Study, L. Harris & Assoc. Inc. Study No. 814002 (January 1981) (less than 1%); and the Arkansas Archival Study (1981) (less than 1%).

Dr. Shure did not maintain that his sample was representative. The West Los Angeles area included Bel Air, Beverly Hills,

Venice, Brentwood and Westwood. And Dr. Shure acknowledged that area had recently had some highly publicized crimes; had few minorities; and was wealthy and conservative. The Harris study, on the other hand, did involve a carefully chosen representative national sample. The Court, while having the highest regard for Dr. Shure's sincerity, is convinced that he is completely "off the map" on his estimate of ADPs. While the Court is willing to concede that local economic and other demographic considerations, and local experience with crime, will have some effect upon the percentages, most of the studies indicate that the percentage of ADPs will vary between .5% and 2.5%. Indeed the studies put the ADP population in Arkansas at between .5% and 1%. This compares with over 14% actually excluded as WEs.

In all fairness, Dr. Shure has acknowledged potential errors and omissions in his study. He does not view it as definitive. Rather that study has been put forth to question the conclusions reached in other studies. He has testified that his ADP figures "must be taken with a grain of salt" and that "I just can't believe the number of ADPs here" and that, "I do believe our figures are inflated and I don't understand why."

The Court finds and concludes that the number of those who would automatically vote for the death penalty in Arkansas and nationwide is negligible when compared to the number of those who would never under any circumstances vote for the death penalty. Therefore to give a defendant the right to challenge and remove ADPs contributes only to the appearances of fairness. In fact, so long as WEs are excluded from the guilt-innocence phase of the trial, the guilt-proneness of the resulting jury remains, to the great disadvantage of defendants.

These findings corroborate the intuitive judgment of the U.S. Supreme Court in *Adams v. Texas, supra,* to wit:

> Finally, we cannot agree that § 12.31(b) is "neutral" with respect to the death penalty since under that section the de-

fendant may challenge jurors who state that their views in favor of the death penalty will affect their deliberations on fact issues. Despite the hypothetical existence of the juror who believes literally in the Biblical admonition "an eye for an eye," see *Witherspoon v. Illinois, supra* [391 U.S.], at 536 [88 S.Ct. at 1784] (Black, J., dissenting), it is undeniable, and the State does not seriously dispute, that such jurors will be few indeed as compared with those excluded because of scruples against capital punishment. The appearance of neutrality created by the theoretical availability of § 12.31(b) as a defense challenge is not sufficiently substantial to take the statute out of the ambit of *Witherspoon.*

*Id.* 448 U.S. at p. 49, 100 S.Ct. at p. 2528.

IV. *The Peremptory Challenge Problem and Proper Limits on Voir Dire.*

It is impossible to deal with the issues presented in this case without at least contemplating the effect thereon of the practice of permitting peremptory challenges, especially in felony and capital cases, where such a large number of such challenges are given to the parties.

Clearly the use of peremptory challenges can completely destroy the "representativeness" of the jury actually chosen to try the case. Also, if *voir dire* as to the jurors' attitudes towards the death penalty be permitted in non-capital felony cases and in bifurcated capital cases (where the jurors have nothing to do with the assessment of the penalty), then peremptory challenges utilized on the basis of the results of such questioning could result in a conviction-prone or prosecution-prone jury even if no challenges for cause were permitted. In such circumstances the opposite also could occur: the exercise of peremptory challenges on the basis of the results of such *voir dire* questioning could result in an "acquittal-prone" or "defense-prone" jury.

In its first *Grigsby* opinion, this Court suggested the separate principles that appear to underlie and justify peremptory challenges. This Court has felt, on balance,

that the granting of peremptory challenges has made the jury selection process fairer, or at least has made it appear to be fairer, than would be the case if such challenges were denied altogether. While still adhering to that view the Court recognizes that issues relating to use and number of peremptory challenges should be reexamined in the light of the empirical data that has been developed recently.

In *Peremptory Challenges in Capital Cases, supra,* Professor Winick reviews the data from a Florida study which demonstrates that prosecutors in the region studied systematically excluded mildly scrupled jurors in capital cases by peremptory challenges after first removing *Witherspoon* Excludables by for-cause challenges. The effect is essentially to return us to the pre-*Witherspoon* situation in which all, or almost all, scrupled jurors (including the mildly scrupled ones) are removed from both the guilt and penalty phases of capital trials. If this is the general practice of prosecutors, it will greatly reinforce both the guilt proneness effect and the under-representativeness effect of the practices here challenged. Professor Winick's study provides a strong basis for arguing that, if state prosecutors are systematically using their peremptory challenges to get rid of non-*Witherspoon* Excludables who hold mild scruples against the death penalty, those prosecutors are violating *Witherspoon* itself for excluding scrupled jurors on a "broader basis" than their "inability to follow the law or abide by their oath." *See Adams v. Texas,* 448 U.S. 38, 48, 100 S.Ct. 2521, 2528, 65 L.Ed.2d 581 (1980). And this study also reinforces Dr. Berry's conclusion in his article *'Fireside Induction', see infra,* that the "gut" judgment of both prosecutors and defense attorneys is that scrupled jurors across the board (even if in differing degrees) are less likely to convict than those who favor or have no scruples against the death penalty. For why else would prosecutors systematically use their peremptory

challenges to remove mildly scrupled jurors? [11] Indeed, one of the experienced prosecutors who testified for the respondent in this case made it clear that if he could not remove a scrupled juror for cause on *Witherspoon* grounds, he would achieve the same result through the use of the state's peremptory challenges.

Although the use of peremptory challenges, properly or improperly, is not before the Court, the issues are so interrelated that the subject cannot be ignored. The question of appropriate limits upon *voir dire* are raised in both contexts. Professor Winick's article offers some interesting suggestions on restructuring *voir dire* to prevent the abusive use of peremptory challenges. *Peremptory Challenges in Capital Cases, supra* at 82–90. The issue is narrower here because we are only concerned with the problem of identifying potential "nullifiers" without introducing the biasing effects of the usual death-qualification *voir dire* process. *See Haney* study, *supra.*

Since this Court has concluded that, if the State wishes to "death qualify" penalty juries, bifurcated trials will be required, *see infra,* the appropriate limits on *voir dire* appear obvious.

*Witherspoon, Lockett v. Ohio,* 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973, and the first opinion of the Court in *Grigsby,* recognize that if prospective jurors hold attitudes toward the death penalty which would prevent them from making an impartial decision as to the defendant's *guilt,* such jurors may be challenged for cause. As noted elsewhere this simply reflects the more general rule that no one should be permitted to sit on the jury who is unable to try the case in accordance with the law and the evidence in keeping with the juror's oath. So, how are these potential nullifiers to be identified?

In a bifurcated case in which the jurors who sit during the guilt-inno-

---

11. A more cynical view would be that they just want to circumvent the effect of *Witherspoon* at the penalty phase by excluding those mildly scrupled prospective jurors that *Witherspoon*

says may not be challenged for cause. If successful they will end up with a "hanging jury," a jury "organized to return a verdict of death" as stated in *Witherspoon* itself.

cence determination phase have nothing to do with the assessment of the penalty, the question arises whether inquiries into the jurors' attitudes towards the death penalty should be permitted *at all* since they will have nothing to do with the assessment of the penalty. It may be argued that the *Lockett* case decided *sub silencio* that such inquiries are permissible in order to identify and remove the "nullifiers" described above. But this question has never been explicitly ruled upon by the Supreme Court. So the question remains: should death-qualification inquiries be permitted in the bifurcated trial situation and, if so, should those inquiries be limited to capital cases? The latter question is raised because some of the testimony in this case indicates, and at least one experiment suggested, that the conviction proneness of jurors who have strong feelings in favor of the death penalty appears to operate with respect to other than capital crimes—at least with respect to other crimes of violence such as assault and rape. An argument could be made that such *voir dire* should be permitted in these non-capital cases so that the state and the defense counsel would know how best to utilize their peremptory challenges. This Court strongly believes that such questioning should *not* be permitted in non-capital cases and doubts that it should be permitted in bifurcated capital cases (where the jurors will have nothing to do with the assessment of the penalty) absent some strong suggestion that the "nullifier" problem exists. In other words, if the court clearly explains to the jurors the alleged facts underlying the capital charge, and points out that the jury chosen will be called upon only to determine the guilt or innocence of the defendant— and not the penalty—and then inquires of the panel if there be any reason why any of them could not fairly and impartially try the issue of the defendant's guilt in accordance with the evidence presented at the trial and the court's instructions as to the law, and none of the jurors respond, then, the Court suggests, further inquiries about the jurors' attitudes towards the death penalty would be inappropriate. This is manifest if one accepts the evidence that such

inquiries themselves will prejudice the jury even if no challenges for cause be permitted. Of course, if a juror indicates that there might be some reason that he or she could not fairly and impartially try the issue of the defendant's guilt, then that juror could be isolated from the other jurors and further inquiry made as to his or her reasons. If scruples against the death penalty were suggested as the reason, then further "death-qualification" questioning could be permitted and the juror excused for cause if it is established that he or she is in fact a "nullifier."

The suggested procedure would also tend to prevent the improper use of death-qualification information by the prosecution or the defense in deciding upon the use of peremptory challenges. *See Peremptory Challenges in Capital Cases, supra.*

It cannot be repeated too often: petitioners are simply asking that their guilt or innocence be determined by a jury which is chosen and composed in essentially the same way that juries are selected in over 99 percent of all criminal cases, i.e., in all non-capital cases. They accept that if such a jury were to convict them, and the state should continue to seek the death penalty, then the state will be entitled to have the penalty assessed by another jury which is properly death-qualified under *Witherspoon,* i.e., by a jury from which persons adamantly opposed to, and adamantly in favor of, the death penalty are removed for cause.

Although the evidence before the court shows that attitudes toward the death penalty are usually coupled with "law and order" concerns on the one hand and "due process" concerns on the other, and thereby are good indicators of conviction-proneness or acquittal proneness, no one has yet argued that either those strongly in favor of the death penalty or those strongly opposed to it should be excluded in cases where the death penalty would never be an issue, e.g., in a simple robbery case. Indeed it is assumed that no inquiry into such attitudes would even be permitted in such non-capital cases, and this is as it should be because

basic to the concept of a "jury" in a democratic society should be the *presumption of inclusion,* i.e., the presumption that all citizens are qualified to serve. Those urging exclusion should, and do, carry the burden of demonstrating good cause therefor. The right to serve on juries should presumptively be considered part and parcel of the status of adult citizenship.

At first glance it may appear that the idea of a cross-section, "representative jury" is at war with the idea of an "impartial jury." Some would argue that for jury service we should exclusively seek the detached, the uninvolved, the coldly objective, —the archtypical "middle of the roader"— rather than the passionate partisans in our society. In the context of this case, the evidence shows, for instance, that those adamantly opposed to the death penalty are more likely to acquit in a close capital case and those strongly in favor of the death penalty are more likely to convict in such cases than their more "neutral" fellow citizens. But if persons in all three groups can in good faith and conscience swear that they can fairly and impartially try the issue of the defendant's guilt or innocence solely upon the basis of the evidence presented and the law as stated by the Court, may any such persons be challenged for cause on the basis of such attitudes or beliefs in the face of the constitutional mandate that juries shall be drawn from a venire composed of a representative cross-section of the community? The answer is, "no." And the empirical data in evidence supports the wisdom of the constitutional mandate. That evidence demonstrates, and common sense confirms, that the quality of the deliberations, the recall of the trial evidence, the likelihood of care and concern in understanding and applying the instructions of the Court as to the applicable law are all enhanced when there is broad diversity and heterogeneity in the jury's makeup. So we must eschew superficially appealing but false notions of neutrality which would, if applied, destroy the jury as a fundamentally democratic institution standing between the defendant and the awesome power of the state.

The Fifth Circuit in the case of *Spinkellink v. Wainwright,* 578 F.2d 582 (5th Cir. 1978), fell into error by not first identifying a constitutionally satisfactory definition of neutrality. This led the court to make the following statement:

> That a death-qualified jury is more likely to convict than a non-death-qualified jury does not demonstrate which jury is impartial. It indicates only that a death-qualified jury might favor the prosecution and that a non-death-qualified jury might favor the defendant.

*Id.* at 594. The court apparently did not note that the petitioners were *not* seeking a jury composed entirely of *Witherspoon* Excludables. On the contrary, they were seeking a jury drawn from the entire cross section of the community as a whole, including both those who strongly favored the death penalty and those who strongly opposed it. In other words, the petitioners in *Spinkellink,* as the petitioners here, were, as pointed out above, seeking the same kind of a jury that is mandated in approximately 99 percent of all criminal cases, i.e., all non-capital cases. One doubts that the Fifth Circuit would label all of those juries as likely to "favor the defendant."

Professor Winick's comments in his article *Peremptory Challenges in Capital Cases* are pertinent:

> The Fifth Circuit has raised a more fundamental objection to inclusion of "automatic life imprisonment" jurors even in a bifurcated trial system. In its view, a jury that included this group, rather than being neutral, might be biased in favor of the defendant, and therefore deny to the state its right to an impartial jury.[12]

---

12. Professor Winick's footnote to this statement is equally important. It states:

*Smith v. Balkcom,* 660 F.2d 573, 578–79 (5th Cir.1981); *Spinkellink v. Wainwright,* 578 F.2d 582, 594–96 (5th Cir.1978), *cert. denied,* 440 U.S. 976 [99 S.Ct. 1548, 59 L.Ed.2d 796] (1979). Underlying the Fifth Circuit's concerns may be the suspicion that "automatic life imprisonment" jurors may really be "automatic acquittal" jurors, although they

This conclusion appears inconsistent with *Witherspoon's* central holding that exclusion of "oppose death penalty" jurors results in an unconstitutionally death-prone jury. As applied to *Witherspoon's* facts, the Fifth Circuit approach would presumably call for affirmance of Witherspoon's death sentence on the basis that juries including "oppose death penalty" jurors are more life imprisonment-prone than death qualified juries, and therefore biased in favor of the defendant. But *Witherspoon* explicitly rejected this contention in favor of a jury that the Court deemed more impartial than one which excludes all death penalty objectors. *Witherspoon* thus suggests that if a capital jury resembling the jury that sits in the typical noncapital case—universally regarded as fair and impartial—is found to be significantly less conviction-prone than a death-qualified jury, then the latter would be constitutionally suspect as a trier of the defendant's guilt.

*Peremptory Challenges in Capital Cases, supra* at 59 n. 199.

The only persons who are appropriately excluded from such juries for cause are those who indicate on *voir dire* that they will not be able to pass upon the guilt or innocence of the accused solely upon the basis of the law and the evidence. Therefore, if a person's attitudes towards the death penalty were such that he could not make the guilt determination solely upon the law and the evidence, he should, of course, be excluded for cause. Otherwise, persons who strongly believe in the death

penalty as well as those who adamantly oppose it should be permitted to join those of their fellow citizens with milder views on such subject in forming a true cross section of the community—the appropriate type of jury to pass upon the guilt or innocence of one accused.

The dissent in the Eighth Circuit's decision in *Grigsby* appears to be based in part upon similar misperceptions of the thrust of the petitioners' arguments. In that dissent it is stated:

> What Grigsby wants is not an impartial jury but a jury biased in favor of acquitting the guilty for whatever reasons might be advanced.

637 F.2d at 532. Elsewhere in the *Grigsby* dissent, it is noted that *Witherspoon* "did not involve the right of the prosecution to challenge for cause the prospective jurors who state that their reservations about capital punishment would prevent them from making an impartial decision as to the defendant's guilt." *Id.* at 530 (quoting *Witherspoon,* 391 U.S. at 513, 88 S.Ct. at 1772). The dissenting opinion then states that "in the present case these are precisely the type of jurors whose exclusion Grigsby objects to." *Id.* at 530. But petitioners in no way argue that such persons should not be excluded. None of the excluded jurors was asked if his strong feelings against the death penalty would "prevent him from making an impartial decision as to the defendant's guilt." Elsewhere in the dissent, it is observed:

swear at voir dire that they are not. However, any such suspicion could not alone justify the exclusion of these jurors consistent with the explicit holding of *Witherspoon* and *Adams* that the factual basis for a venireperson's exclusion on account of death penalty attitudes must be "unmistakably clear." * * * Moreover, if death penalty opponents constitute a cognizable class for sixth amendment cross-section purposes, *see* Section IV–B, *infra,* the exclusion of these jurors based on such suspicion would also violate the *Taylor-Duren* prohibition of the use of rough rules of thumb in the jury selection context.

\* \* \* \* \* \*

Indeed, if the Fifth Circuit's view is correct, prosecutors presumably should be able to

interrogate venirepersons in noncapital cases (assuming that their prosecution proneness would apply there as well) concerning their view on the death penalty, and remove for cause those who could never impose it. Nowhere, however, is this allowed. Haney, *Juries and the Death Penalty: Readdressing the Witherspoon Question,* 26 CRIME & DELINQUENCY 512, 514 (1980) (The process of "death qualification" is "unique to capital cases. In no other instance are prospective jurors systematically queried about their attitudes toward a particular legal punishment and then excluded, as a matter of law, depending on how they answer.") 81 Mich.L.Rev. at 59 n. 199.

To contend that a juror holding positive views on the validity of the death penalty would vote to find an innocent defendant guilty is absurd.

*Id.* at 531–32. Precisely. But is it not equally absurd to contend that a non-nullifier juror holding strong negative views toward the validity of the death penalty would vote to find a guilty defendant innocent, assuming that that person was to have no role in assessing the punishment? It in no way follows that people who have strong feelings against the death penalty do not wish to see persons guilty of capital crimes convicted and punished.[13] Indeed it is assumed and accepted that both such persons, although from opposite ends of the spectrum with respect to their death penalty attitudes, have stated on *voir dire* that they will—and both have taken an oath to—base their decision upon the evidence presented and the law given to them by the court. Indeed petitioners contend that both such persons would be qualified to sit as jurors for *guilt determination,* whereas they recognize that *neither* will be qualified to assess punishment where death is a lawful alternative that must be considered.

V. *State's Justification of Challenged Practice.*

The petitioners having demonstrated infringements of their Sixth Amendment and due process rights, "There is no need to show particularized bias.... The only remaining question is whether there is adequate justification for this infringement." *Duren v. Missouri,* 439 U.S. 357, 368 n. 26, 99 S.Ct. 664, 670 n. 26, 58 L.Ed.2d 579 (1979). And *Duren* makes it clear that the burden of justification rests on the state. Furthermore, the burden imposed upon the state is a heavy one: the petitioners' rights to a proper jury "cannot be overcome on merely rational grounds." *Taylor v. Louisiana,* 419 U.S. 522, 534, 95 S.Ct. 692, 699, 42 L.Ed.2d 690 (1975).

The Court finds and concludes that most of the State's legitimate interest can be accommodated by requiring completely bifurcated trials in capital cases—with one jury to determine the guilt-innocence of the defendant and another jury to determine the penalty if the defendant is convicted. The Court makes this determination before discussing the State's justification of its death-qualification procedures so that the merits of the State's justification arguments can be measured against this least intrusive alternative procedure.

And, before assessing the state's justification arguments, it is also very important to identify more clearly the state's interests by examining the development of the Arkansas juror challenge law as it relates to death qualification in capital cases.

Arkansas statutes have for more than a century consistently provided that a challenge for implied bias may be made, and prospective jurors struck for cause, "[w]hen the offense is punishable with death, the entertaining of such conscientious opinions as would preclude him from finding the defendant *guilty.*" Ark.Stat. Ann. § 43–1920. (emphasis supplied) By its very terms, the current statute, like its predecessors, allows exclusion of "nullifiers" only. In other words, the exclusion of a prospective juror is allowed only where his opinions, whatever they may be, preclude him from being able to fairly judge the guilt or innocence of the defendant. These "exclusion" statutes never sanctioned the removal for cause of those jurors who could not impose the death penalty, but who could, nevertheless, fairly and impartially pass upon the question of the defendant's guilt or innocence in accordance with the law and the evidence. This was made clear in the case of *Atkins v. State,* 16 Ark. 568 (1855) as follows:

It appears that a *venire facias* was issued for thirty-eight jurors, and a list of per-

---

**13.** This is, of course, separate and apart from the question of the degree of proof which might be necessary to convince one or the other of the guilt of the accused. *See* discussion of "guilt-proneness" *supra.* The empirical data

and studies discussed above should remove any concern or doubt that non-nullifier WEs will never vote to convict or even that they will usually vote to acquit.

sons summoned duly served upon the prisoner. When the jurors were called to the bar for the purpose of making up the jury, it seems that the court propounded the following interrogatories to four of the regular panel: "Do you entertain any opinion, which would preclude you from finding a prisoner guilty, where the punishment is death, if the evidence *would justify the verdict, *or in other words, are you opposed to capital punishment?*"

And they severally answered "that they were opposed to capital punishment."

Whereupon, the counsel for the prisoner moved the court to limit the enquiry, and ask the jurors the questions in these or similar words: "Are your opinions such as to preclude you from finding any defendant guilty of an offense punishable with death?"

Which motion the court overruled, and decided that if a juror answered that *"he was opposed to capital punishment,* he was incompetent and disqualified as a juror, and the defendant excepted.

The 158th *sec., chap. 52, Dig.,* declares that "persons whose opinions are such as to preclude them from finding any defendant guilty of any offense punishable with death, shall not be allowed or compelled to serve as jurors on the trial of an indictment for any offense punishable with death."

The court surely erred in rejecting the jurors, because they were opposed to capital punishment, *unless they had gone further and brought themselves within the disqualification prescribed by the statute.*

Whatever may be a man's views of capital punishment as a question of policy, the jury box is not the proper place for him to consider such policy. There he is obliged, by his oath, to try the guilt or innocence of the accused, according to law and evidence, and not to set up his own private opinion against the policy of the law, which he is bound, as a good citizen, to abide by and administer, so long as it is in force, and until it is repealed by the constituted authority.

See the authorities collected on this subject in *Wharton's Crim. Law* 857, 858. *Id.* at 579–80. (Last emphasis only supplied.)

It is noteworthy that the United States Supreme Court cited the *Atkins* case in *Witherspoon* for the proposition that an irrevocably held opinion against the death penalty would not necessarily disqualify a juror from service if he could still abide by his oath:

It is entirely possible, of course, that even a juror who believes that capital punishment should never be inflicted and who is irrevocably committed to its abolition could nonetheless subordinate his personal views to what he perceived to be his duty to abide by his oath as a juror and to obey the law of the State. See *Commonwealth v. Webster,* 59 Mass. 295, 298. See also *Atkins v. State,* 16 Ark. 568, 580....

*Witherspoon,* 391 U.S. at 514 n. 7, 88 S.Ct. at 1773 n. 7. So, over 100 years before *Witherspoon,* the Arkansas Supreme Court ruled precisely as petitioners wish it would rule today, to wit: that opposition to the death penalty, regardless of the strength or degree of that opposition, is not alone a sufficient basis for excluding a person from the trial of the guilt-innocence of a person charged with a capital crime. *Atkins* holds that only if one's attitude "would preclude him from finding the defendant *guilty,* may such a person be excluded? If the *Atkins* rule were the Arkansas law today these habeas cases would not be before a federal court because petitioners would have won their point in the State Courts. When and how did the Arkansas law change?

The cases following *Atkins* likewise show that the emphasis continued to be placed on whether conscientious scruples would preclude a juror from rendering a verdict on guilt or innocence.

The ninth and tenth grounds of motion for new trial were not well taken. The defendant is charged with a capital offense. Sections 1505–6 Mansfield Digest. This being true, it was altogether proper for the prosecuting attorney to ask the

jurymen on their *voir dire* if they had any conscientious scruples *that would preclude them from returning a verdict of guilty* when the law and evidence would justify the same; and, on their answering the question in the affirmative, it was not error in the court to excuse them.

*Jones v. State,* 58 Ark. 390, 397, 24 S.W. 1073, 1075 (1894) (emphasis supplied).

Of course, under former Arkansas practice the jury returned only one verdict which resolved the issue of guilt and, if the defendant was convicted, fixed the penalty. The guilt-innocence phase and the separate penalty phase is of rather recent vintage. Since the same jury passed upon both issues at the same time the focus became blurred. Note the language in *Bell v. State,* 120 Ark. 530, 180 S.W. 186 (1915).

> The court permitted the State, over the objection of appellant, to ask the jurors, on their *voir dire,* if they had such scruples against capital punishment *as would prevent them from finding the defendant guilty* where their verdict would mean his execution. Upon the jurors answering in the affirmative the court sustained the State's challenges for cause.
>
> Under the law, as we construe it, capital punishment has not been abolished, and it still being within the province of trial juries to return a verdict that would result in capital punishment, *the State,* in the trial of cases where the death penalty may be imposed, *is entitled to a jury that has no conscientious scruples as to such penalty.*

*Id.* at 542–43, 180 S.W. 186, 191–92 (emphasis supplied). Here the court is still insisting on the proper statutory challenge ("scruples ... as would prevent them from finding the defendant *guilty*") while going on to state that the State, in the trial of cases where the death penalty may be imposed, "is entitled to a jury that has no conscientious scruples as to such penalty."

And yet, the Arkansas Supreme Court continued to require the *statutory* challenge language. In *Williams v. State,* 186 Ark. 738, 55 S.W.2d 928, the Court stated:

We understand this assignment refers to the questions asked prospective jurors on their *voir dire* concerning any conscientious scruples *they might have in returning a verdict of guilty* where the punishment is fixed by law at death if the facts justified such a verdict. We understand further that the objections made go to the form of the questions only. The form of the questions objected to varied somewhat in wording, but substantially they were all the same. For instance, one juror was asked this question: "Have you any conscientious scruples against *returning a verdict of guilty* where the punishment is fixed at death if the facts justify returning a verdict of that sort?" Another was asked: "Have you any conscientious scruples against *voting for a verdict of guilty* where the law fixes the punishment at death?" Substantially all the questions were the same. It is well settled in this State that there is no error in permitting the prosecuting attorney to ask prospective jurors such questions.

*Id.* at 738–39, 55 S.W.2d 928 (emphasis added). Therefore, until shortly before *Witherspoon* in 1968, Arkansas law appears to have required a more favorable situation for the trial of defendants accused of capital crimes than even that for which they argue here. Before the 1960s, if a person's views on capital punishment would not affect his ability to try the issue of the defendant's *guilt* he could not be challenged for cause, and, once seated, he would automatically vote on the sentence, even though his convictions concerning the death penalty might be such that he could never under any circumstances impose it. The petitioners here do not contend such a person should sit on the penalty jury, as such a person apparently could, and did, before *Witherspoon.*

As stated above, at the time these cases were tried, Arkansas followed a "single verdict" procedure in capital cases which did not allow for separate hearings with respect to the guilt and the sentencing of the defendant. *Maxwell v. Bishop,* 398 F.2d 138, 150–51 (8th Cir.1968), *rev'd,* 398 U.S. 262, 90

S.Ct. 1578, 26 L.Ed.2d 221 (1970). It was not until 1973 that the Arkansas legislature created what the Arkansas Supreme Court found to be a constitutionally acceptable bifurcated procedure in capital cases. *Collins v. State,* 259 Ark. 8, 12–13, 531 S.W.2d 13, 15 (1975). It appears that when the Arkansas Circuit Court tried the *Maxwell* case in 1962 that the transition from judicial focus on the effect of conscientious scruples on an impartial determination of *guilt* to judicial focus on the existence of those scruples themselves as a *per se* reason to exclude any prospective juror in a capital case appeared to be complete. The United States Supreme Court found that at least one juror in the *Maxwell* case had been excused solely for an affirmative answer to the question: "Do you entertain any conscientious scruples about imposing the death penalty?" *Maxwell,* 398 U.S. at 264, 90 S.Ct. at 1580. *Maxwell* was returned to the district court to evaluate this *voir dire* in light of *Witherspoon.*

Between the time *Witherspoon* had been decided in 1968 and the United States Supreme Court's decision in *Maxwell* in 1970 there remains no doubt that the Arkansas Supreme Court had decided to no longer adhere to the limitation on exclusion of jurors as provided by the statute. Instead it decided that if a juror could never vote to impose the death penalty, he could be excluded altogether. No inquiry apparently had to be made as to whether the juror was nevertheless capable of rendering a fair and impartial verdict upon the guilt or innocence of the defendant. The case of *Davis v. State,* 246 Ark. 838, 440 S.W.2d 244 (1969), decided about one year following *Witherspoon,* clearly shows the change in focus. Not only did the Arkansas Supreme Court allow the exclusion of jurors opposed to the death penalty, but it relied for its reasoning on the language in the *Atkins* case, the very case in which it was held such jurors could *not* be excluded on that basis alone. In the words of the Court:

> Appellant contends here that the trial court erred, under the holding in *Witherspoon v. Illinois,* 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), in excluding jurors who had conscientious scruples against capital punishment. A subsidiary argument is that the trial court insured the prosecution's request for a conviction and death sentence by excluding all prospective jurors who said they opposed the death sentence or had religious or conscientious scruples against the death penalty. We do not believe that the record sustains appellant's argument.
>
> As we read the record, the trial court followed the *Witherspoon* case, excluding Justice Douglas's concurrence, and our own case of *Atkins v. State,* 16 Ark. 568 (1855). In the latter case we pointed out:
>
> > "Whatever may be a man's view of capital punishment as a question of policy, the jury box is not a proper place for him to consider such policy. There he is obliged, by his oath, to try the guilt or innocence of the accused, according to law and evidence, and not to set up his own private opinion against the policy of the law, which he is bound, as a good citizen, to abide by and administer, so long as it is in force, and until it is repealed by the constituted authority. See the authorities collected on this subject in Wharton's Crim.Law 857, 858."
>
> To follow appellant's argument to its logical conclusion would create a kind of anarchy in our system of government whereby the minority will always hold a veto over any established public policy. For instance, since the holding in *Bloom v. Illinois,* 391 U.S. 194, 88 S.Ct. 1477, 20 L.Ed.2d 522 (1968), it would be almost impossible to enforce some provisions of the 1964 Civil Rights Act, if a court were forced to accept jurors whose private opinions are contrary to the policy of the law. For these reasons we find this point without merit.

*Davis,* 246 Ark. at 541–42, 440 S.W.2d at 247.

In *Davis* there is no mention of the statute authorizing exclusion: nor is it stated, as was always emphasized in the earlier cases, that scruples against the death penalty must be such as will preclude the juror in

question from rendering an impartial verdict on the defendant's *guilt*. In fact, after *Davis,* the Arkansas Supreme Court appears to have abandoned its reliance on the statute concerning the issue of exclusion for death penalty scruples and, instead, exclusively relied upon *Witherspoon* (which ostensibly enlarged the rights of defendants) to enlarge the right of the state to exclude jurors. *See Neal v. State,* 259 Ark. 27, 31, 531 S.W.2d 17, 21 (1975), *O'Neal v. State,* 253 Ark. 574, 577, 487 S.W.2d 618, 621 (1972), *Montgomery v. State,* 251 Ark., 645, 649, 473 S.W.2d 885, 888–89 (1971).

By 1976 the Arkansas Supreme Court had progressed beyond simply reiterating the *Witherspoon* rule in striking down challenges to the practice of excusing those excludable under *Witherspoon.* Instead the court advanced the additional rationale that, while there may be some truth to the proposition that the jurors remaining after *Witherspoon* excludables were removed were more likely to convict, nevertheless, in Arkansas' bifurcated capital procedure the same jurors ruled on both guilt and sentencing and a nullification of the imposition of the death penalty would occur if *Witherspoon* excludables were not removed from the entire procedure. *Venable v. State,* 260 Ark. 201, 205–06, 538 S.W.2d 286, 289–90 (1976). *See also Giles v. State,* 261 Ark. 413, 425–26, 549 S.W.2d 479, 486 (1977).

The bottom line of this analysis is that prior to *Witherspoon,* Arkansas focused on the most traditional and accepted of *voir dire* inquiries: whether a prospective juror's scruples would preclude him from rendering a verdict of guilty and the court relied directly on the legislatively mandated language. After *Witherspoon,* the court no longer relied on the exclusion statute but simply adopted *Witherspoon* as the predicate for a *judicially established Arkansas rule* that allowed the exclusion of prospective jurors from the guilt-innocence phase on the ground that they could never impose the death penalty if called upon to assess a penalty. Although it was argued that Arkansas had a bifurcated capital procedure and *Witherspoon* excludables should be allowed to sit for the guilt phase of that

procedure, the court has held that the statute allows for but one jury for both phases and, therefore, if jurors can be excluded under *Witherspoon* at the sentencing phase by constitutional rule, then they are automatically bumped out at the guilt phase. The Arkansas Supreme Court in so ruling made no effort to deal with the apparent conflict between Section 43–1920 and its own judicially developed for-cause challenge in the light of the vital interests of capital defendants in a trial of their guilt or innocence by an impartial and representative jury. Confronted with a state policy reflected by Section 43–1920 which would prevent exclusion at the guilt phase of any prospective juror whose conscientious opinions would not preclude him from finding a defendant in a capital case "guilty," *see Atkins,* and another state policy that required that both the guilt and penalty phases be tried by the same jury, they opted to give priority to the latter state interest and, to further implement that policy, by creating a new challenge for cause that had never existed before and was contrary to the earlier Arkansas law. The Court could have said that Section 43–1920 controlled and that it would not depart from *Atkins.* This would have given the state the option of not death qualifying capital juries or of going back to the legislature with a request for a truly bifurcated trial in capital cases— one jury to determine guilt or innocence and another jury, if the defendant were convicted, to assess the penalty. And, of course, if the legislature created that model then not only its legitimate interest in death qualifying jurors at the penalty phase but also its vital interest in a fair trial for capital defendants, as reflected in Section 43–1920, could have been fully and consistently protected. It is certainly not fair to argue that the State of Arkansas has a lesser interest in fair trials of the issue of guilt-innocence of persons accused of capital crimes than it has in any possible financial savings that might accrue from having the same jury handle both phases of capital trials.

No criticism can, of course, be made of a judicially created rule that would say that no person adamantly opposed to the death penalty will be permitted to sit on a jury whose mission it is to determine, under standards prescribed by the legislature, whether to impose the penalty of death or the penalty of life imprisonment. Indeed such a rule would be parallel to, and consistent with, section 43–1920 since the rationale of each is that no one shall be permitted to sit on a jury in a situation in which he cannot in good conscience swear to impartially try the issue presented (the guilt-innocence in the one case and the penalty in the other) solely upon the basis of the law and the evidence. The problem occurs when the proper penalty phase challenge is permitted to be the basis for excluding people from the guilt-innocence phase who can, and will swear to, try such issue impartially and solely upon the basis of the law and the evidence.

The State has also argued, and the Court has accepted, that, under current Arkansas practice, those persons who have been classified as ADPs (Automatic Death Penalty) may be challenged for cause just like WEs (*Witherspoon* excludables). Transcripts of state *voir dires* assertedly reveal and confirm that practice. If this is true such challenges are not based upon any Arkansas statute, and it must also be true the judicial acceptance thereof is, like challenges of those who are adamantly opposed to the death penalty, a thing of recent origin. See *Needham v. State,* 215 Ark. 935, 939–40, 224 S.W. 785, 787 (1949) which would suggest that at least until very recent times, the Arkansas law would not recognize such challenges:

> The defense counsel sought to ask a prospective juror if he would feel obligated to impose the death penalty rather than life imprisonment upon a finding of guilty. *There was no prejudicial error in the trial court's refusal to allow this inquiry.* Appellant argues that his question was merely the converse of the State's inquiry as to conscientious scruples, but we are unable to agree. The trial court has no discretion in permitting

the State's inquiry, for the statute expressly recognizes such scruples as a cause for challenge. *There is no corresponding statutory recognition of implied bias in favor of capital punishment; so the matter rests within the trial court's discretion.* We have pointed out that the possible causes of bias are infinite. *Pierce v. Sicard,* 176 Ark. 511, 3 S.W.2d 337. It is for this reason that the trial court is necessarily given a broad discretion in controlling the examination of veniremen. Here the trial court stated that he did not think the juror could give a definite answer to the question without knowing all the evidence to be presented. In the absence of anything in the juror's earlier interrogation to indicate that he had a marked predilection for capital punishment we have no basis for finding an abuse of discretion.

(emphasis supplied)

It is somewhat ironic to realize that the Arkansas law which the petitioners now challenge apparently had if not its origins then its rationalization in the 1968 decision of the Supreme Court in *Witherspoon.* Since that decision held that states would be permitted to exclude those who adamantly opposed the death penalty *if they should choose to do so,* the Arkansas Supreme Court apparently decided to create challenges for cause for that purpose without the benefit of any explicit legislative policy statement to that effect. Of course, as pointed out above, such challenges for cause *at the penalty phase* would be entirely in keeping with the traditional challenges created by both legislatures and the courts because it is fundamental that no one should sit on a jury who cannot, and who therefore cannot swear to, try the issue presented (here the penalty to be assessed) in accordance with the law and the evidence. But by permitting such a challenge of a prospective juror who was to try the guilt-innocence of the defendant, the Arkansas Supreme Court had to depart from the Arkansas Statute (Section 43–1920), and its own prior rulings, *see Atkins,* supra,

leaving the present Arkansas law 180° out of phase therewith.

So we are not dealing here with ancient and traditionally accepted applications of venerable rules of state practices. To the contrary, we are here dealing with state rules developed judicially in recent years mostly in response to a U.S. Supreme Court decision (*Witherspoon*), which have dramatically changed those rules from what they were for almost a century and a half. Although petitioners would obviously like to return to the pre-*Witherspoon* Arkansas standards entirely, they only argue here to return to the situation where people will not be excluded *at the trial of their guilt-innocence* on the basis of their death penalty views. They concede that Arkansas may stay with its newly developed rule which permits the exclusion of those adamantly opposed to the death penalty *at the penalty phase* of capital trials.

Does the State have any interest in preserving its death qualification procedures that can justify the use of the resulting biased juries for guilt determination purposes?

The following accepted propositions are repeated for the purpose of this analysis:

1. The petitioners here concede that the State has the right to death-qualified jurors who will participate *in the penalty phase* of the trial. Therefore, the State's interest in vindicating its policy concerning capital punishment by obtaining a capital sentence in any appropriate case is not challenged.

2. The petitioners concede that the State has the right to exclude at the guilt determination phase of the trial all prospective jurors who make "unmistakably clear ... that their attitude toward the death penalty would prevent them from reaching an impartial decision as to the defendant's guilt." *Witherspoon,* 391 U.S. at 522–23 n. 21, 88 S.Ct. at 1776–77 n. 21. It follows that the State's interest in a fair trial of the issue of guilt or innocence is not in any way challenged in this lawsuit.

What the petitioners are seeking is a ruling by this Court that they are entitled to a fair trial before an impartial jury with respect to their guilt or innocence. To ac-complish this, they ask this Court to prohibit the exclusion at the *guilt determination phase* of prospective jurors whose sole asserted disqualification consists of their inability to vote for the death penalty at the *penalty phase of the trial.*

Since the State's interest in removing jurors who are adamantly opposed to the death penalty at the penalty phase of the trial is recognized, and since the State's interest in removing any jurors who are for any reason unable to make a determination of the guilt or innocence of the defendant solely on the basis of the law or the evidence, it follows that the State's principal interest in preserving death qualification or the death qualification process boils down to a question of efficiency and money. The State simply does not want to pay the expense of having two separate juries, one to determine guilt and the other, if necessary, to determine penalty.

If such a bifurcated system were established, would it mean that in every case in which the State sought the death penalty two separate juries would have to be impaneled? The answer is, obviously, no. To require the impanelment of the second jury, the guilt phase jury would have to end with the conviction of the defendant, in accordance with the statutory requirements, of capital murder (not a conviction on a lesser included offense, e.g., first degree murder); it would have to reject any insanity claim; and, finally, the State would have to continue to seek the death penalty and to insist upon its consideration by a fully death-qualified jury. It is interesting to note that in the *Grigsby* case, no death-qualified jury would have been required at the penalty phase because, after obtaining the conviction of capital murder, the State decided to waive the death penalty.

The point is that a bifurcated procedure would impose upon the State some additional expense if the results of the guilt determination phase of the capital trial so warranted. But capital trials themselves comprise a miniscule percentage of all criminal trials.

In those cases where a separate, death-qualified jury would be required at the penalty phase, the State would bear the cost of the additional jurors. There would be a second *voir dire*. It is likely that some portion of the evidence introduced during the guilt-determination trial would have to be re-introduced. Procedures could be developed so that the penalty-phase jury could be impaneled promptly after the conclusion of the guilt-determination trial so that witnesses would not become unavailable or other evidence lost. All of the actors in the drama would be the same except the jurors, so no significant additional preparation time would be required.

Respondent notes that Arkansas' present procedure can work to the detriment of the state: "... if a court vacates only a death sentence but affirms a conviction, the State is precluded from retrying only the penalty phase of the trial to a new jury. It faces the choice of completely retrying the defendant through both the guilt and penalty phases or foregoing the attempt to again impose the death penalty." Respondent's Reply Brief p. 38. This result is said to follow from the present requirement of Ark.Stat.Ann. Section 41–1301(3) which mandates that both phases be tried to the same jury. The Respondent then notes a possible benefit to the State should true bifurcation be required:

> "If the courts mandate separate juries ... the State could also use that holding to its advantage in attempting more efficiently to reimpose a vacated death penalty."

Respondent's Reply Brief p. 38.

The respondent State of Arkansas introduced no evidence to establish the burden in dollars which the bifurcated trial procedure would impose upon it. But it is clear to the Court, in the context of the overall criminal justice system of the State, that said cost would be relatively small. Indeed, there is some merit to petitioner's argument that the bifurcated process might not cost the State more than the existing procedure. Using the existing procedure, the death-qualification process now occurs in *every* trial in which the State seeks the death penalty. State prosecutors testified at the trial that the death-qualification process often takes up as much time as the trial itself. On the other hand, it is clear that penalty trials do not occur in all cases that begin as capital cases. (Mr. Grigsby's case is an example.) If the death-qualification process is eliminated from the guilt-determination phase, it may not be needed at all. One thing is certain: the guilt-determination phase of the trial would be much shorter and much more clearly focused upon the true issue—the guilt or innocence of the accused.

It is a rare situation when the United States Supreme Court permits financial considerations to take priority over constitutional rights. To deserve such priority, the asserted interests of the State must be substantial. This view was succinctly addressed in *Ballew v. Georgia,* 435 U.S. 223, 98 S.Ct. 1029, 55 L.Ed.2d 234 (1978), which involved a challenge to Georgia's procedure of trying misdemeanor cases to a five-person jury. The case arose in the wake of *Williams v. Florida,* 399 U.S. 78, 90 S.Ct. 1893, 26 L.Ed.2d 446 (1970), which had upheld the use of six-person juries in non-capital criminal trials. The State in *Ballew* argued that financial considerations had played a role in the Supreme Court's *Williams* decision and that if such considerations could justify a reduction in the requisite size of the jury from twelve to six, the marginal cost savings achieved by a reduction from six to five jurors would likewise justify the existence of the Georgia procedure. The Supreme Court was unpersuaded. It acknowledged that "substantial" financial benefits might inure to the states from the reduction of juries from twelve to six members. The Court found, however, that "a reduction in size from six to five or four or even three would save the states little." *Id.,* 435 U.S. at 244, 98 S.Ct. at 1041. Cost savings alone, the Court concluded, could not justify the resulting prejudicial effects on the rights of the accused misdemeanants.

 Two important lessons may be gleaned from the Court's analysis in *Ballew.* First, that financial savings must be substantial before they can begin to justify the creation of procedural rules that violate the

constitutional rights of an accused. Second, that a court may disregard a state's financial savings argument even when applied to persons accused of committing mere misdemeanors. If the financial considerations fail to outweigh the constitutional interests of those who face light terms of imprisonment or fines, it would surely follow that financial considerations can very seldom if ever outweigh the interests of those facing heavy penalties. When, as here, we are dealing literally with life and death, the cost-savings arguments of the state simply lose all force.

As stated in *Gardner v. Florida,* 430 U.S. 349, 360, 97 S.Ct. 1197, 1205, 51 L.Ed.2d 393 (1977):

> [I]f the disputed matter is of critical importance, the time invested in ascertaining the truth would surely be well spent if it makes the difference between life and death.

And as stated in *Reid v. Covert,* 354 U.S. 1, 77, 77 S.Ct. 1222, 1261, 1 L.Ed.2d 1148 (1956):

> ... [Capital] cases ... stand on quite a different footing than other offenses. In demands for ... procedural fairness ... I do not concede that whatever process is "due" an offender faced with a fine or prison sentence necessarily satisfies the requirements of the Constitution in a capital case. The distinction is by no means novel [citation omitted]; nor is it negligible, being literally that between life and death. ·

*See also Gregg v. Georgia,* 428 U.S. 153, 187, 96 S.Ct. 2909, 2931, 49 L.Ed.2d 859 (1976); *Lockett v. Ohio,* 438 U.S. 586, 604–05, 98 S.Ct. 2954, 2964–65, 57 L.Ed.2d 973 (1978); and *Woodson v. North Carolina,* 428 U.S. 280, 305, 96 S.Ct. 2978, 2991, 49 L.Ed.2d 944 (1976).

The Court finds and concludes that the State's interests in using the present death-qualification system in capital cases cannot justify its effects on guilt determinations in capital cases. Nor can such interests justify the destruction of the representativeness of the juries which result from death qualification. In sum the respondent has failed to carry its burden of justifying the use of nonrepresentative and partial juries in the trial of the guilt or innocence of those accused of capital crimes.

## VI. *Conclusion.*

The Constitution does not prohibit the death penalty in all cases. Death may be the punishment for certain crimes (if not imposed upon a mandatory basis) so long as the procedures used in imposing that penalty meet constitutional standards. One of those procedures—jury selection in capital cases—has been the subject of great attention by the courts since *Witherspoon* was decided in 1968. Those procedures and the composition of the juries they produce have also been subjected to rigorous study by psychologists and social scientists.

The U.S. Supreme Court, in leaving the critical "life and death" decisions in these cases to juries, has assumed that capital juries reflect the conscience and the standards of decency of the community when they make such decisions. If this assumption is shown to be invalid then the whole rationale fails. In *Witherspoon* the Supreme Court recognized that this assumption would not hold true if the state were permitted to remove from the penalty-determination phase all persons who had scruples of any kind against the death penalty.

Before a person may be subjected to the possibility of the death penalty he necessarily must be convicted of a capital crime. In this guilt-innocence determination phase of his trial a defendant charged with capital punishment should be, and is entitled to a fair and impartial jury and he is also entitled to a jury composed of a fair cross-section of the community, a jury which will represent and reflect the conscience of that community. The evidence introduced here makes it abundantly clear that juries death-qualified under *Witherspoon* standards are not as representative of the community as they could, and should, be, and, therefore, do not serve the objective of interposing between the state and the defendant the conscience and broad collective wisdom of that community. It is also clear that such juries cannot be considered fair and impartial with respect to the issue of the guilt-innocence of defendants in capital cases.

The phrase "fireside induction" has been used to refer to "those common sense empirical generalizations about human behavior which derive from introspection, anecdotal evidence, and culturally transmitted beliefs." [14] Dr. Robert M. Berry's article "Fireside Induction," *see supra,* states that the "fireside induction suggests that in equivocal or ambiguous cases jurors who favor the death penalty are more likely to vote for conviction whereas jurors who oppose the death penalty are more likely to vote for acquittal." He goes on to say: "Broadly stated, the fireside induction suggests that proponents of the death penalty are conviction-prone and opponents of the death penalty are acquittal-prone." *Id.* at 6.

Dr. Berry states, and the Court agrees, that both defense attorneys and prosecutors accept this induction as a proposition which "everyone knows," even though prosecutors have argued that their views are to the contrary. He is convinced that "the prosecution shares the view of the fireside induction held by the defense." *Id.,* at 7. The evidence and the discussion above support his opinion.

Dr. Berry observes that the law usually reflects these fireside inductions which may or may not accord with empirical behavioral science studies and principles. To him the current death-qualification practices, predicated on *Witherspoon* standards, represent an instance where the fireside induction, held and accepted by most active participants in the trial milieu, has not been accepted and is not presently reflected in the law. Tension develops because the verbal rationalizations and justifications for those practices are at odds with our intuitive feelings and judgments as to the real truth of the matter.

But the Court suggests the "gut" judgments of trial lawyers and judges as to the fairness of *voir dire* procedures, and as to the necessity therefor, are not just intuitive generalizations about human experience but also represent a reflection of the training and experience of such persons over time in the courtrooms of this nation. After one has conducted or observed hundreds of *voir dire* examinations and has read endless pages of transcripts of the death qualification process he should be able to form a judgment as to whether such procedures are fair or whether they tend to prejudice one or the other party. Likewise he should be able to ask and answer if there be any good reason to justify the exclusion of a prospective juror and if that exclusion prejudices or benefits one or the other party. This is simply: law work.

Here the fireside inductions clearly support the contentions of petitioners. If asked, "Does the removal of all prospective jurors with adamant objections to the death penalty result in a jury more prone to convict?" Trial lawyers and judges will answer, "yes, of course." If asked, "Does the usual process of death qualification itself, as observed time and again, prejudice the defendant? The answer, "yes, clearly."

Yet it is always possible that our dearly held "fireside induction" may be proved to have been in error, to be nothing more than professional superstition. And the U.S. Supreme Court in *Witherspoon* itself counsels against embracing *per se* rules based upon judicial notice or intuition without the benefit of empirical studies.

The research has been done. The studies have been introduced into evidence and explained. What do they show? They prove that what we "knew" all along is in fact true. The trial lawyers and judges could have been wrong but in this case at least they were right.

The evidence supports, and the Court agrees with, the following conclusions reached by Dr. Berry in his article:

> When the other survey evidence is considered, the clear thrust of the evidence has been to establish that persons who favor the death penalty are "uncommonly" predisposed to find for the prosecution and against the defendant.
> All of the studies and all of the surveys display a common element: they demon-

**14.** Meehl, *Law and Fireside Inductions: Some Reflections of a Clinical Psychologist, in Law* *Justice and the Individual in Society (J. Tapp & F. Levine Eds.1977).*

strate that there is a significant difference between those potential jurors excludable under *Witherspoon* and those jurors who could be "death-qualified" under *Witherspoon*. That is, all of the studies uniformly support the fireside induction. Under these conditions, Meehl noted that:

> The legislator's, judge's, or administrator's situation is most comfortable when there is a sizable and consistent body of research, experimental and nonexperimental (file data and field observation data), yielding about the same results as the fireside inductions. While one may be scientifically skeptical even in this harmonious situation, in the pragmatic context of decision making, rule writing, or policy adopting, such rigorous skepticism can hardly lead to pragmatic vacillation. Some sort of action is required, and all we have goes in the same direction.

The appropriate action would seem to require the conclusion that death-qualified juries are not only "uncommonly," but also unconstitutionally, prone to convict. A constitutional decision will, of course, have to meet the constitutional standard, which requires that the WE group constitute a distinctive, identifiable group. It is obvious, however, that the WE group is distinctive and identifiable, since members of this group are currently excluded on the basis of their distinctive and identifiable attitudes toward the death penalty. The convergent conclusions from the fireside induction and from social science research is that the exclusion is not irrelevant, but basic to fair and impartial judgments of guilt or innocence.

The appearance of a neutral jury is achieved by eliminating both the ADP group and the WE group. In reality, jury neutrality is not achieved, however, and the inadequacy is more than a matter of the unequal distribution of ADPs and WEs. Haney has discussed the range of possible solutions to the multiple problems introduced by death qualification and has concluded that even modified forms of death qualification would violate the constitutional requirements of a fair and impartial trial. Haney's thoughtful analysis suggests that the most reasonable solution is a bifurcated trial with death-penalty attitude forming a basis for exclusion only at the penalty phase. In many jurisdictions, bifurcated trials already occur in civil cases with one jury assessing liability and another deciding damages. This practice is especially likely to be observed as the importance of the case increases, although no such case even begins to approach the life or death seriousness of capital cases involving death qualification.

Paraphrasing *Adams v. Texas* this Court now holds that if prospective jurors in capital cases are barred over the defendant's objection from jury service because of their views on capital punishment on any broader basis than inability to follow the law or to abide by their oaths, the guilty verdict must be set aside. The evidence and the records show that prospective jurors in Mr. Grigsby's case and Mr. McCree's case were so barred from jury service over the specific objection of each.

The Eighth Circuit asked the Court to factually determine:

(a) Whether prospective jurors in these habeas cases were disqualified for their death penalty views. The answer is, "yes."

(b) Whether the resulting death-qualified juries were more prone to convict petitioners than would be non-death qualified juries. The answer is, "yes."

If the answers were "yes" to these questions, the Eighth Circuit asked this Court to then determine the appropriate remedy. Both legal precedents and logic make the answer clear: Convictions so obtained must be set aside with new trials permitted if desired by the State.

Where the defendant's right to a representative jury under the Sixth Amendment is violated his conviction must be set aside. *Duren v. Missouri, supra.* No harmless error analysis is permitted because the very integrity of the fact finding function of the jury is directly implicated. See *Taylor v. Louisiana,* 419 U.S. 522, 95 S.Ct. 692, 42

**1324**

L.Ed.2d 690 (1975). The result in *Wither-spoon* (not a Sixth Amendment case) provides no support for a contrary view. There the Court found the penalty phase contaminated by the then existing Illinois death qualification procedures. At that time it felt it could not determine on the basis of the record before it whether that practice also contaminated the guilt-innocence phase of the trial. So it simply set aside the death penalty while leaving the conviction intact. Now, however, upon a completely different evidentiary record this Court has found and concluded that, through the death qualification practices permitted by the State of Arkansas in the guilt-determination phase of capital trials, petitioners were denied their right to a neutral jury and to a representative jury. If the U.S. Supreme Court had reached similar conclusions in *Witherspoon* can there be any doubt as to the remedy it would have required?

Mr. Hulsey has been denied the right to raise these "Grigsby issues" because of his failure to object to the challenged procedures as required in State court. And Mr. Grigsby is now deceased. The Court will therefore set aside the conviction of Mr. McCree only and direct the respondent, within 90 days, to retry him or to set him free.